# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued March 25, 2022         Decided March 1, 2024

No. 15-1239

ENVIRONMENTAL COMMITTEE OF THE FLORIDA ELECTRIC
POWER COORDINATING GROUP, INC.,
PETITIONER

v.

ENVIRONMENTAL PROTECTION AGENCY AND MICHAEL S.
REGAN,
RESPONDENTS

CITIZENS FOR ENVIRONMENTAL JUSTICE, ET AL.,
INTERVENORS

———

Consolidated with 15-1256, 15-1265, 15-1267, 15-1268,
15-1270, 15-1271, 15-1272

———

On Petitions for Review of a Final Action
of the Environmental Protection Agency

———

*Evan M. Ezray*, Deputy Solicitor General, Office of the Attorney General for the State of Florida, argued the cause for state petitioners. On the briefs were *Ashley Moody*, Attorney General, *Henry C. Whitaker,* Solicitor General, *Daniel W. Bell*, Chief Deputy Solicitor General, *Jason H. Hilborn*, Deputy Solicitor General at the time the brief was filed, *Steve Marshall*, Attorney General, Office of the Attorney General for the State of Alabama, *Edmund LaCour*, Solicitor General, *Tim Griffin*, Attorney General, Office of the Attorney General for the State of Arkansas, *Nicholas Bronni*, Solicitor General, *Vincent M. Wagner,* Deputy Solicitor General at the time the brief was filed, *Kris Mayes*, Attorney General, Office of the Attorney General for the State of Arizona, *Drew C. Ensign*, Deputy Solicitor General at the time the brief was filed, *Kathy Jennings*, Attorney General, Office of the Attorney General for the State of Delaware, *Valerie Satterfield Edge*, Deputy Attorney General, *Kris Kobach*, Attorney General, Office of the Attorney General for the State of Kansas, *Jeffrey A. Chanay*, Chief Deputy Attorney General, *Christopher M. Carr,* Attorney General, Office of the Attorney General for the State of Georgia, *Stephen J. Petrany*, Solicitor General, *Russell Coleman,* Attorney General, Office of the Attorney General for the Commonwealth of Kentucky*, Matthew F. Kuhn*, Solicitor General, *Brett R. Nolan*, Principal Deputy Solicitor General at the time the brief was filed, *Jeff Landry*, Attorney General, Office of the Attorney General for the State of Louisiana, *Elizabeth B. Murrill*, Solicitor General*, Lynn Fitch*, Attorney General, Office of the Attorney General for the State of Mississippi, *Mary Jo Woods*, Special Assistant Attorney General, *Andrew Bailey*, Attorney General, Office of the Attorney General for the State of Missouri, *D. John Sauer*, Deputy Attorney General, *Sam M. Hayes, David Yost*, Attorney General, Office of the Attorney General for the State of Ohio, *Benjamin M. Flowers*, Solicitor General at the time the brief was filed, *Gentner Drummond*, Attorney General, Office of the Attorney General for the State of Oklahoma, *P. Clayton Eubanks*, Assistant Attorney General, *Marty Jackley*, Attorney

General, Office of the Attorney General for the State of South Dakota, *Steven R. Blair*, Deputy Attorney General, *Alan Wilson*, Attorney General, Office of the Attorney General for the State of South Carolina, *J. Emory Smith, Jr.,* Deputy Solicitor General, *Jonathan Skrmetti,* Attorney General, Office of the Attorney General for the State of Tennessee, *Wilson S. Buntin,* Senior Assistant Attorney General, *Ken Paxton,* Attorney General, Office of the Attorney General for the State of Texas, *Priscilla M. Hubenak*, Chief, Environmental Protection Division, *Kellie E. Billings-Ray*, Assistant Attorney General, *Patrick Morrisey,* Attorney General, Office of the Attorney General for the State of West Virginia, *Lindsay S. See,* Solicitor General. *Christopher J. Baum*, Deputy Solicitor, Office of the Attorney General for the State of Florida, *Aaron S. Farmer*, Principal Assistant Attorney General, Office of the Attorney General for the State of Ohio, *Phillip R. Hilliard,* Assistant Attorney General, Office of the Attorney General for the State of Tennessee, *Thomas T. Lampman*, Assistant Attorney General, Office of the Attorney General for the State of West Virginia, *Justin L. Matheny*, Deputy Solicitor, Office of the Attorney General for the State of Mississippi, *Joseph A. Newberg, II,* Assistant Attorney General, Office of the Attorney General for the Commonwealth of Kentucky, *James H. Percival, II,* Chief Deputy Solicitor General, Office of the Attorney General for the State of Florida, *Andrew A. Pinson*, Solicitor General, Office of the Attorney General for the State of Georgia, *Lee P. Rudofsky*, Solicitor, Office of the Attorney General for the State of Arkansas, and *Megan K. Terrell*, Assistant Attorney General, Office of the Attorney General for the State of Louisiana, entered appearances.

*Russell S. Frye* argued the cause for industry petitioners. With him on the briefs were *Lauren E. Freeman, C. Max Zygmont, C. Grady Moore, III, Randy E. Brogdon, Robert A. Manning, Joseph A. Brown, Margaret C. Campbell, Carroll W.*

*McGuffey, III, M. Brant Pettis, Melissa Horne, Terese T. Wyly, P. Stephen Gidiere, III, Gary V. Perko, Leslie Sue Ritts, J. Michael Showalter, Patrick F. Veasy, Matthew Kuryla, Devi Chandrasekaran,* and *Samara L. Kline. Amy C. Antoniolli* and *Hahnah Williams* entered appearances.

*David J. Kaplan* and *Sarah A. Buckley*, Attorneys, U.S. Department of Justice, argued the causes for respondents. With them on the briefs were *Todd Kim*, Assistant Attorney General, *Andrew S. Coghlan*, Attorney, *Seth Buchsbaum*, Attorney, U.S. Environmental Protection Agency, and *Paul Bangser, Sheila Igoe,* and *Jan Tierney*, Attorneys.

*Andrea Issod* argued the cause for environmental intervenors. With her on the briefs were *Joshua D. Smith, Seth L. Johnson, James S. Pew, Patton Dycus, John Walke, Emily Davis,* and *Paul Cort. Eric Schaeffer* entered an appearance.

Before: SRINIVASAN, *Chief Judge*, PILLARD and WALKER, *Circuit Judges*.

Opinion of the Court filed PER CURIAM.

Opinion concurring in part and dissenting in part filed by *Circuit Judge* PILLARD.

PER CURIAM: The Clean Air Act requires the federal government and the states to work together to protect the nation's air. First, the Environmental Protection Agency identifies pollutants that endanger public health and welfare and sets air-quality standards that the states must meet. Then, the states develop state implementation plans to meet and enforce those standards. Those plans are called SIPs.

EPA's role goes beyond simply making sure that SIPs will enable states to meet the air-quality standards. Before a SIP can go into effect, EPA also makes sure that it complies with specific requirements that the Clean Air Act imposes for SIPs. Then, after a SIP is approved, EPA must call for the state to revise it if the SIP is substantially inadequate to comply with a requirement of the Act.

In this case, EPA called for 35 states and the District of Columbia to revise their SIPs, though it has since withdrawn its calls to three of those states. Two sets of petitioners, a group of about half the states whose SIPs EPA called and a set of companies that are subject to those SIPs, level an array of challenges against EPA's SIP Calls.

We grant their petitions in part and deny them in part.

## BACKGROUND

We first explain the relevant parts of the Clean Air Act. Then, we provide background on the types of SIP provisions at issue in this case. Last, we describe the underlying EPA action and this case's winding path to our decision today.

### I.

Congress passed the Clean Air Act in 1963. Pub L. No. 88-206, 77 Stat. 392 (1963). But until 1970, states "generally retained wide latitude to determine both the air quality standards which they would meet and the period of time in which they would do so." *See Train v. NRDC*, 421 U.S. 60, 64 (1975). That year, frustrated with the states' lack of progress toward cleaner air, Congress enacted the 1970 Amendments to the Act. *Id.*

The 1970 Amendments changed the regulatory paradigm, replacing the old, state-centered model with "an exercise in cooperative federalism." *Dominion Transmission, Inc. v. Summers*, 723 F.3d 238, 240 (D.C. Cir. 2013). The Amendments empowered the newly created EPA to set air-quality standards to protect public health and welfare. *Train*, 421 U.S. at 64-65. And they required the states to implement, maintain, and enforce those standards in a timely manner. *Id.*

Among other things, SIPs set rules to limit the emissions that a source can release. Those rules are often source-specific and sometimes take the form of a formula. *See, e.g.*, GA. COMP. R. & REGS. 391-3-1.02(2)(c)-(z). Emission-control rules may also include, for example, technological control requirements or work practice requirements.

In addition to enabling states to meet the air-quality standards that EPA sets, SIPs have to comply with a number of the Clean Air Act's specific legal requirements. Among the most important is a requirement that SIPs:

> include enforceable emission limitations and other control measures, means, or techniques (including economic incentives such as fees, marketable permits, and auctions of emissions rights), as well as schedules and timetables for compliance, as may be necessary or appropriate to meet the applicable requirements of this chapter.

42 U.S.C. § 7410(a)(2)(A). SIPs also must, for example, provide for monitoring systems, set up a permitting scheme, and "include a program to provide for the enforcement of the" emission-control measures. *Id.* § 7410(a)(2)(C); *see also id.* § 7410(a)(2)(B), (a)(2)(L).

Congress tasked EPA with ensuring that SIPs comply with the Act's requirements. If a SIP submission meets "all of the applicable requirements" of the Act, EPA must approve it. *Id.* § 7410(k)(3). If a state wants to revise its SIP, EPA reviews the proposed revision and may only approve it if it does not interfere with attainment of the national ambient air quality standards (NAAQS) "or any other applicable requirement" of the Act. *Id.* §§ 7410(k)(2)-(3), 7410(*l*); *see also id.* § 7515.

Then, when EPA signs off on a new or revised SIP, it incorporates the SIP into the Code of Federal Regulations, which makes it a federally enforceable regulation. *Dominion Transmission, Inc.*, 723 F.3d at 244. Once the SIP is approved and incorporated, EPA, state and local governments, and citizens can all sue to enforce it. *Nat'l Mining Ass'n v. EPA*, 59 F.3d 1351, 1363 (D.C. Cir. 1995); 42 U.S.C. §§ 7413(b), 7602(e), 7604(a). In those suits, courts can award injunctive relief or monetary damages. 42 U.S.C. §§ 7413(b), 7602(e), 7604(a).

If that system works, that can sometimes be the end of the story. But if problems arise, EPA must address them. Specifically, the Act mandates that:

> Whenever the Administrator finds that the applicable implementation plan for any area is substantially inadequate to attain or maintain the relevant national ambient air quality standard, to mitigate adequately the interstate pollutant transport described in section 7506a of this title or section 7511c of this title, or to otherwise comply with any requirement of this chapter, the Administrator shall require the State to revise the plan as necessary to correct such inadequacies.

*Id.* § 7410(k)(5).

When EPA uses that authority to require states to revise their SIPs, it is referred to as a SIP Call. If the EPA issues a SIP Call, it must identify the SIP's substantial inadequacies and set a deadline that affords the state no more than 18 months to "revise the [SIP] as necessary to correct such inadequacies." *Id.* The state need not undergo "a wholesale revision of its entire plan," but must make revisions necessary to correct the substantial inadequacies EPA identified. *Virginia v. EPA*, 108 F.3d 1397, 1410 (D.C. Cir. 1997), *modified on reh'g on other grounds*, 116 F.3d 499. Should a state fail to timely revise its SIP, or should EPA disapprove the state's submission, EPA must timely promulgate a federal implementation plan for that state. *See* 42 U.S.C. § 7410(c)(1).

## II.

During periods when a source starts up, shuts down, or malfunctions—SSM periods—Petitioners say the source may not be able to comply with the emission rules that apply during regular operation. *See* Restatement and Update of EPA's SSM Policy Applicable to SIPs, 80 Fed. Reg. 33,840, 33,843 (June 12, 2015) (defining "SSM"). Some SIPs thus include a variety of SSM provisions that can insulate sources from liability for emissions during SSM periods that exceed the emission levels permitted under the regular rule.

Four types of SSM provisions are at issue in this case.

First, some SIPs include "automatic exemptions," which exclude SSM periods from otherwise applicable emission rules.

Second, other SIPs include "director's discretion" provisions, which allow state officials to independently and conclusively decide that excess emissions are not violations during SSM periods.

Third, at least one SIP includes provisions that EPA believes could be read to allow state officials to excuse emission violations during SSM periods in a way that forecloses EPA or citizen-suit enforcement. EPA called those "overbroad enforcement discretion" provisions. Unlike director's discretion provisions—which let state officials determine that there is no violation—overbroad enforcement discretion provisions let state officials recognize that a violation happened but bar enforcement.

Fourth, many SIPs include affirmative defenses for excess emissions that occur during SSM periods. Some affirmative defenses protect sources against all liability, while others protect only against certain forms of relief. *E.g.*, 118-01-19 ARK. CODE § 602 (all liability); ARIZ. ADMIN. CODE § 18-2-310(B)-(C) (providing an affirmative defense except in a "judicial action seeking injunctive relief").

III.

This case's origins date back over a decade. In June 2011, Sierra Club filed a petition for rulemaking. Among other requests, it identified 39 SIPs that it believed included SSM provisions that made the SIPs unlawful, and it asked EPA to call them.

Twenty months later, EPA published a proposed rule in response to Sierra Club's petition. It initially indicated its intent to grant Sierra Club's petition as to all types of SSM provisions except affirmative defenses to monetary damages

for excess emissions during malfunctions. Then, in *NRDC v. EPA*, we vacated a similar affirmative defense in a federal emission standard. 749 F.3d 1055, 1058, 1064 (D.C. Cir. 2014). So EPA published a supplemental notice in which it proposed to grant Sierra Club's petition as to those affirmative defenses as well.

Comments flowed in. Sixty-nine thousand different commenters offered their thoughts on the original proposed rule, and twenty thousand commenters responded to the supplemental notice.

In 2015, after considering those comments, EPA published its Final Action. It called SIPs from 35 states and the District of Columbia.

EPA began by explaining why it was now calling SIPs it had previously approved. When Congress enacted the 1970 Clean Air Act amendments, it set an ambitious timetable for implementing the cooperative-federalism framework. It gave EPA 30 days (plus a 90-day notice-and-comment period) to develop the first air-quality standards. *Train*, 421 U.S. at 65. Then, the states had nine months from EPA's promulgation of air-quality standards to submit SIPs. *Id.* From there, EPA had four months to verify that each SIP complied with the Clean Air Act and, if so, to approve it. *Id.* That timetable was a tall order for an EPA that had been created less than a month earlier. Reorganization Plan No. 3 of 1970, *reprinted in* 5 U.S.C. app. 1 (creating EPA effective December 2, 1970); Pub. L. No. 91-604, 84 Stat. 1676 (Dec. 31, 1970) (1970 Amendments).

In the SIP Calls here, EPA explained that the timetable proved too tall an order: "[B]ecause the EPA was inundated with proposed SIPs and had limited experience in processing

them, not enough attention was given to the adequacy, enforceability and consistency of" SSM provisions. 80 Fed. Reg. 33,840, 33,843/3 (June 12, 2015).

On the merits of its call, EPA first explained its view that it can call any SIP that "contains a provision that is inconsistent with fundamental requirements of the" Clean Air Act. *Id.* at 33,926/3. As EPA reads the Act, it does not need to demonstrate that the substantial legal infirmity has had any demonstrated ill effects; its existence is enough.

EPA then identified the aspects of the Act that it believes the SSM provisions are inconsistent with.

It started with automatic exemptions. Because EPA reads the Act to "require that SIPs contain 'emissions limitations' to meet CAA requirements" and "those emissions limitations must be continuous," 80 Fed. Reg. 33,927/2, it argues that automatic exemptions bring SIPs out of compliance with the Act. The Act defines an emission limitation as a requirement that limits emissions "on a continuous basis." 42 U.S.C. § 7602(k). According to EPA, an exemption would make the limitation discontinuous and thus violate the Act's definition of an emission limitation.

Next, EPA applied the same logic to director's discretion provisions. It determined that allowing state officials to decide that excess emissions during SSM periods were not a violation makes an emission limitation as discontinuous as simply having a categorical exemption. In addition, EPA thought that if a state official can decide to waive an emission limitation's application, such waivers would amount to "*de facto* revisions of the approved emission limitations" without EPA approval. 80 Fed. Reg. at 33,928/1.

After that, EPA explained that overbroad enforcement discretion provisions unlawfully blocked the Act's enforcement scheme by allowing a state to unilaterally bar an EPA or citizen suit.

Finally, EPA concluded that affirmative defense provisions similarly interfere with the Act's enforcement scheme. EPA's reasoning tracked the logic of the *NRDC* decision that had persuaded EPA to revise its interpretation and issue the supplemental notice of proposed rulemaking. *See NRDC*, 749 F.3d at 1063-64.

Three sets of petitioners sought our review: Texas and a coalition of Texas companies and trade groups; a group of other states that petitioned together; and a group of industrial companies and organizations. The Sierra Club and other environmental groups intervened to support EPA. The many parties completed extensive briefing, and we scheduled an oral argument for May 8, 2017. Then, less than a month before argument, EPA asked us to postpone the argument as the new administration reconsidered the SIP Calls. We agreed, and the case remained in abeyance for more than four years.

During those four years, EPA withdrew its calls to Iowa, North Carolina, and Texas—leaving 32 states and the District of Columbia subject to the SIP Calls. That mooted the Texans' petitions for review and meant that the SIP Calls issued to North Carolina and Iowa are not before this court, nor are the SIP Calls directed at states that never joined the petition. That leaves sixteen State Petitioners and the Industry Petitioners.

In November 2021, EPA reaffirmed the original SIP Calls as to the remaining states and moved to reopen this case. We granted the motion and now resolve the case as follows.

In part I of the analysis, we evaluate EPA's SIP-call authority. In part II, we evaluate EPA's specific objections to the four types of SSM provisions.

ANALYSIS

We set aside an EPA SIP Call if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or if it is "in excess of [EPA's] statutory jurisdiction, authority, or limitations." 42 U.S.C. § 7607(d)(9)(A), (C); *see also Maryland v. EPA*, 958 F.3d 1185, 1196 (D.C. Cir. 2020). We employ the traditional tools of statutory interpretation to determine what the Clean Air Act requires. *Sierra Club v. EPA*, 551 F.3d 1019, 1026-27 (D.C. Cir. 2008). Courts, like EPA, "must give effect to the unambiguously expressed intent of Congress." *Id.* at 1026 (quoting *Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837, 844 (1984)). If, however, the Clean Air Act is ambiguous on a particular issue, we defer to the agency's reasonable interpretation of the Act. *Id.*

State and Industry Petitioners challenge EPA's SIP Calls on two fronts. First, they argue that EPA misinterpreted its SIP-call authority under section 7410(k)(5) of the Clean Air Act. Second, they claim that EPA incorrectly interpreted the Act, as well as the SIPs in question, when it called the SIPs for containing at least one of four types of SSM provisions that EPA deemed impermissible: (1) automatic exemption provisions, (2) director's discretion provisions, (3) overbroad enforcement discretion provisions, and (4) affirmative defense provisions. We consider each challenge in turn.

I.

We begin by addressing Petitioners' crosscutting challenges to EPA's statutory authority to issue any of these disputed SIP Calls. Section 7410(k)(5) of the Clean Air Act

sets out EPA's SIP-call authority. It states, as relevant here, that whenever EPA "finds" that a SIP is "substantially inadequate" to "comply with any requirement of this chapter," then EPA "shall" require the state to "revise the [SIP] as necessary to correct such inadequacies." 42 U.S.C. § 7410(k)(5). State and Industry Petitioners advance four arguments why EPA misinterpreted its SIP-call authority. First, they assert that EPA lacked authority to call the SIPs without making *factual* findings about the real-world effects of the inadequate SIPs, even when calling SIPs as substantially *legally* inadequate to "comply with any requirement" of the Act. Second, Petitioners insist that, when issuing a SIP Call, EPA must consider each SIP "as a whole," rather than object to individual provisions in isolation. Third, they maintain that ambiguity in a SIP provision—that is, where it is unclear whether a SIP provision conflicts with the Act—can never be a sufficient basis for issuing a SIP Call. Fourth, and finally, they argue that EPA must engage in a cost-benefit analysis whenever it calls a SIP and that failure to do so renders the challenged action arbitrary and capricious. We consider each of those arguments and conclude that, in its Final Action, EPA abided by the strictures of its SIP-call authority under section 7410(k)(5).

## A.

Petitioners contend that, before EPA issues any SIP Call under section 7410(k)(5), it must make factual findings about adverse effects resulting from the SIP's deficiencies—for example, by identifying instances in which the SSM provisions at issue prevented or will prevent attainment of the national ambient air quality standards (NAAQS). That argument is at odds with the statutory text and structure. While factual findings about the effects of SIP inadequacies may be needed to support some types of SIP Calls, section 7410(k)(5) does not

categorically require them. The Act obligates EPA to issue a SIP Call whenever it determines that a SIP does not comply with the Act's legal requirements, so long as the legal deficiencies are "substantial[]." 42 U.S.C. § 7410(k)(5). A SIP Call based on failure to comply with the Act's legal requirements need not be withheld until the agency is able to document actual or anticipated damage to the environment, to human health or welfare, or to any other objective of the Act. Requiring such a factual showing would impermissibly "place[] an information submission obligation on EPA [that] Congress did not impose," *EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489, 510 (2014).

We start with the statutory source of EPA's authority to call a SIP. Section 7410(k)(5) of the Act compels the agency to call a SIP whenever it "finds" that the SIP is "substantially inadequate" for one of three reasons: (1) "to attain or maintain the relevant national ambient air quality standard," (2) "to mitigate adequately the interstate pollutant transport," or (3) "to otherwise comply with any requirement" of the Act. 42 U.S.C. § 7410(k)(5). Those three distinct grounds for issuing a SIP Call are stated as alternatives, separated by the word "or." In using that conjunction, Congress made clear that a substantial inadequacy to "otherwise comply with any requirement" of the Act (per the third stated ground) is by itself sufficient to require EPA to call the SIP. *Id.* EPA need not also show the SIP meets the standard to be called under the first ground for failure to attain or maintain the NAAQS, or under the second ground for failure to mitigate interstate pollutant transport.

EPA might call a SIP for failure to comply with the Act (*i.e.*, under the third ground) in a variety of circumstances. To provide a few examples, a SIP might be challenged as inadequate under the third ground if the state fails to provide

for the operation of air quality monitoring devices, *id.* § 7410(a)(2)(B), to ensure personnel to carry out the plan, *id.* § 7410(a)(2)(E), to require periodic reporting of emissions-related data from stationary sources, *id.* § 7410(a)(2)(F)(ii), to provide for consultation with local governments, *id.* §§ 7410(a)(2)(J), 7421, to submit air quality modeling data to EPA, *id.* § 7410(a)(2)(K)(ii), or to address non-NAAQS pollutants in new source review permit programs, *id.* §§ 7470-79, 7503.

In the action under review, EPA relied on that third ground for issuing a SIP Call. 80 Fed. Reg. 33,840, 33,925/3 (June 12, 2015). EPA concluded that the SIPs were substantially inadequate to comply with the Act's requirements for emission limitations, its remedial and enforcement provisions, and its procedural requirements for revising a SIP. *See, e.g.*, *id.* at 33,874/2-75/2, 33,957/2-74/2. The inadequacies EPA identified were legal in nature—that is, the SIPs on their face conflicted with the Act's legal requirements vis-à-vis SIPs.

We first consider what findings, if any, the plain text of section 7410(k)(5) requires when EPA calls a SIP for legal inadequacies. Under the third ground, EPA plainly must find that a SIP is substantially inadequate to "comply with any requirement" of the Act. 42 U.S.C. § 7410(k)(5). That is, EPA must determine that a SIP provision has not conformed to "those statutory and regulatory requirements that are germane to the SIP provision at issue." 80 Fed. Reg. at 33,925/3.

The shortcoming EPA identifies must also be one that renders the SIP "substantially inadequate" to comply with the Act. 42 U.S.C. § 7410(k)(5). In the SIP Calls, EPA noted that "section 110(k)(5) [*i.e.*, 42 U.S.C. § 7410(k)(5)] does not specify a particular form of analysis or methodology that the EPA must use to evaluate SIP provisions for substantial

inadequacy." 80 Fed. Reg. at 33,926/1. EPA noted that, for some SIP Calls, a "technical evaluation" of the inadequacy might be warranted. *Id.* at 33,937/1. But calling a SIP that on its face violates key legal requirements of the Act "does not require that type of technical analysis and does not require a 'quantification' of the extent of the deficiency." *Id.* To determine that a SIP is "substantially inadequate," EPA need conclude only that it is materially deficient, or falls short in a meaningful, nontrivial way. *See, e.g.*, WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 1176 (1990) ("substantial" includes "being largely but not wholly that which is specified"); WEBSTER'S NEW WORLD DICTIONARY 1336 (3d. coll. ed. 1988) ("substantial" includes "with regard to essential elements; in substance"); *id.* at 680 ("inadequate" means "not adequate; not sufficient; not equal to what is required"). The Final Action abides by that ordinary understanding of "substantially inadequate": Where SIPs threaten to undermine the "fundamental integrity of the [Clean Air Act]'s SIP process and structure" and allow the Act's emission rules to be "violated without potential recourse," 80 Fed. Reg. at 33,926/3, they readily clear the threshold of substantial inadequacy.

Beyond determining that the SIP is deficient and that such deficiency is material, EPA need not invariably make factual findings about the effects of that asserted legal deficiency—for example, on air quality. Section 7410(k)(5)'s third ground imposes no such limitation. Under that clause, EPA is obligated to call a SIP that is substantially inadequate for purposes of "any" Clean Air Act requirement, 42 U.S.C. § 7410(k)(5), no matter the degree to which that requirement is shown to impair the SIP's ability to protect the environment or human health and welfare. In some cases, as here, the requirement will be legal in nature—for example, a requirement about what SIPs must contain, not what emission reductions the state must achieve. Under those circumstances,

noncompliance may be readily apparent from the statutory text and the SIP itself. As EPA recognized, "it is not necessary to establish that these deficiencies literally caused a specific violation of the NAAQS on a particular day or undermined a specific enforcement case." 80 Fed. Reg. at 33,937/1. Failure to comply with the Clean Air Act's legal requirements "does not become legally permissible merely because there is not definitive evidence" of adverse environmental or other effects caused by that noncompliance. *Id.* at 33,926/2.

Our conclusion that EPA need not, as a blanket rule, make factual findings about the effects of a legal inadequacy accords with section 7410(k)(5)'s requirement that EPA "find" a substantial inadequacy. Because Congress has not defined the term "find" as used in section 7410(k)(5), we "construe [that] statutory term in accordance with its ordinary or natural meaning." *FDIC v. Meyer*, 510 U.S. 471, 476 (1994); *see also Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2363 (2019). The ordinary meaning of "find" is "to settle upon and make a statement about (as a conclusion)." WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 464 (1990); *see also Find*, BLACK'S LAW DICTIONARY (6th ed. 1990) ("to determine"). To be sure, in legal usage, "find" sometimes connotes factfinding, as distinct from reaching a legal conclusion. *See, e.g.*, FED. R. CIV. P. 52 (requiring courts in a bench trial to make findings of fact and state conclusions of law separately); *Find*, BLACK'S LAW DICTIONARY (6th ed. 1990) (defining "find" to include "[t]o announce a conclusion upon a disputed fact or state of facts"). But the word "find" "easily admits of multiple meanings," *Schiller v. Tower Semiconductor Ltd.*, 449 F.3d 286, 300 (2d Cir. 2006), and is not limited to that particular legal usage. "And it is normal usage that, in the absence of contrary indication, governs our interpretation of texts." *Freeman v. Quicken Loans, Inc.*, 566 U.S. 624, 634 (2012). EPA's reading—that it may "find" a SIP provision inadequate

where the SIP "does not meet applicable legal requirements," even "without definitive proof that this legal deficiency caused a specific outcome," 80 Fed. Reg. at 33,934/2—is faithful to the ordinary, popular meaning of the word "find."

In short, the text of section 7410(k)(5) instructs that EPA shall issue a SIP Call whenever it concludes that a SIP is materially deficient to comply with any requirement of the Act. In the Final Action, EPA did exactly that, explaining why in its view the SIPs were deficient to comply with the Act's requirements for emission limitations, its remedial and enforcement provisions, and its procedural requirements for revising a SIP. *See, e.g.*, *id.* at 33,874/2-75/2, 33,957/2-74/2. EPA further explained why those asserted deficiencies were "substantial." *See, e.g.*, *id.* at 33,926/3, 33,927/1-29/3. At least where EPA calls a SIP for substantial legal inadequacies, section 7410(k)(5) requires nothing more.

Statutory structure and context confirm that EPA need not in all cases make factual findings about the practical effects of asserted inadequacies before calling a SIP for substantial legal inadequacies.

First, our reading comports with section 7410(a)(2)(H)(ii), which requires SIPs to "provide for revision" of their own terms "whenever [EPA] finds on the basis of information available to [EPA] that the plan is substantially inadequate . . . to otherwise comply with any additional requirements established under this chapter." 42 U.S.C. § 7410(a)(2)(H). Sections 7410(a)(2)(H)(ii) and 7410(k)(5) "complement[]" one another. *Virginia*, 108 F.3d at 1410. The former describes what the states must include in their SIPs—that is, they must reserve the legal authority to revise their SIPs in the event EPA deems them substantially inadequate, *see* 42 U.S.C.

§ 7410(a)(2)(H)(ii)—while the latter codifies EPA's SIP-call authority, *see id.* § 7410(k)(5).

Petitioners home in on the phrase "on the basis of information available," which appears only in section 7410(a)(2)(H)(ii), to assert that EPA must make factual findings. They read EPA's SIP-call authority in section 7410(k)(5) to incorporate language from section 7410(a)(2)(H)(ii) requiring EPA to find substantial inadequacy "on the basis of information available." That claim fails. For one, we agree with EPA that, unlike section 7410(k)(5), "section 110(a)(2)(H)(ii) [42 U.S.C. § 7410(A)(2)(H)(ii)] does not on its face directly address the scope" of EPA's authority to call SIPs. 80 Fed. Reg. at 33,934/2. We thus do not interpret section 7410(a)(2)(H)(ii)'s "listing of specific structural or program requirements" for SIPs "in a way that contradicts or curtails the broad [SIP-call] authority" that Congress codified in section 7410(k)(5). *Id.* at 33,934/2-3.

Even if one were to consider section 7410(a)(2)(H)(ii) in isolation, Petitioners overread the phrase "on the basis of information available." By its own terms, section 7410(a)(2)(H)(ii) does not specify any particular type of supportive material for an EPA determination of substantial inadequacy. It demands only that a SIP Call be based on available "information," which ordinarily refers to "data," "facts," or "knowledge acquired in any manner." WEBSTER'S NEW WORLD DICTIONARY 222 (2d. coll. ed. 1974). It is well within EPA's authority under section 7410 to base a finding of substantial inadequacy on the agency's knowledge acquired through comparing a SIP's provisions to the relevant Clean Air Act requirements. By allowing EPA to decide to call a SIP based on "available" information, Congress made clear that EPA does not need to gather new information or set forth factual findings. Put otherwise, EPA has the authority to

request additional information from the states as needed, *see* 42 U.S.C. § 7410(p), but is under no obligation to do so.

Second, our reading respects that section 7410(k)(5), governing EPA's SIP-call authority, suggests the agency should evaluate states' earlier-approved SIPs with a degree of leeway not afforded when EPA reviews states' initial SIP submissions or their proposed revisions. When a state submits a SIP or SIP revision for approval, EPA may not approve it unless "it meets all of the applicable requirements" of the Act. *Id.* § 7410(k)(3). Moreover, EPA may not approve a SIP revision if it "would interfere with any applicable requirement" of the Act, *id.* § 7410(*l*)—that is, if it would cause the state to backslide or come out of compliance with the Clean Air Act's requirements, *see* 80 Fed. Reg at 33,941/3. Those standards governing EPA's approval of SIPs and their revisions appear to require EPA to ensure absolute or near-absolute compliance with the Act.

In contrast, Congress directed EPA, when calling an earlier-approved SIP, to apply a more forgiving compliance standard. Under section 7410(k)(5), a SIP's failure to comply with the Act's requirements must be "substantial[]," 42 U.S.C. § 7410(k)(5), thereby preventing EPA from calling an approved SIP based on slight variations from the Act's requirements. The higher bar on SIP Calls than on initial approvals makes sense: While Congress sought to ensure strict compliance with the Act in the first instance, it did not want EPA calling long-approved implementation plans for minimal forms of noncompliance too insubstantial to justify a re-do.

There may well be provisions of the Act, then, with which a SIP's failure to ensure compliance should prevent the SIP's initial approval but, if only identified later, would not justify a SIP Call. To the extent that those provisions exist, Petitioners

do not argue that the main provision at issue in the Final Action—section 7410(a)(2)(A), specifying some of the key required contents of SIPs—is among them. And for good reason. That section, which directs that each SIP "shall" include "emission limitations" and "other control measures, means, or techniques" as "necessary or appropriate" to meet the Act's requirements, goes to the heart of SIPs' role in EPA's and states' implementation and enforcement of the Act. *See id.* § 7410(a)(2)(A).

We now turn to a third and final reason why the statutory context and structure demand only an EPA determination of substantial legal inadequacy and not necessarily factual findings about the adverse effects resulting from the SIP's deficiencies: Namely, an across-the-board obligation for EPA to make such factual findings would perturb the federal-state balance Congress struck in the Clean Air Act.

The Clean Air Act is an exercise in cooperative federalism. One of the core obligations it imposes on EPA is to identify air pollutants that endanger public health and welfare, and to set standards for permissible ambient concentrations of those pollutants. *See id.* §§ 7408-09. Congress then obligates states to determine how they will meet those air-quality standards, affording each state leeway to select means consistent with its particular circumstances and priorities, and to accordingly develop its own implementation plan for EPA's approval. *See id.* § 7410(a)(2). EPA cannot require states to adopt a particular emission-control measure, *see Virginia*, 108 F.3d at 1408, and did not do so in the challenged SIP Calls, giving states a range of options to correct their deficient SIPs, *see, e.g.*, 80 Fed. Reg. at 33,947/1; *see also id.* at 33,976/2-82/2. But, while states generally have "the power to determine which sources w[ill] be burdened by regulation and to what extent," *Union Elec. Co. v. EPA*, 427 U.S. 246, 269 (1976), the Act

"'subject[s] the states to strict minimum compliance requirements' and gives EPA the authority to determine a state's compliance with the requirements," *Michigan v. EPA*, 213 F.3d 663, 687 (D.C. Cir. 2000) (quoting *Union Elec. Co.*, 427 U.S. at 256-57).

By requiring a determination of "substantial[] inadequa[cy]" before EPA must issue a SIP Call, Congress ensured that EPA cannot call states' already-approved SIPs for slight or immaterial noncompliance with the Act. 42 U.S.C. § 7410(k)(5). At the same time, Congress recognized EPA's need to act prophylactically to protect air quality and entrusted EPA to ensure states achieve the Act's objectives. *See generally id.* §§ 7401(a)(3)-(4), (c), 7410(k)-(*l*). Mandating that EPA factually demonstrate observed adverse effects on air quality or enforcement, as State Petitioners urge, would contravene the statutory text and undercut the role that Congress reserved for EPA in the Clean Air Act. Just as EPA cannot force the states to adopt a particular control measure, the states cannot force EPA to wait for air quality to deteriorate, or for human health and welfare to suffer, before seeking corrections to SIPs with substantial legal deficiencies. After all, "[a]n agency need not suffer the flood before building the levee." *See Stilwell v. Off. of Thrift Supervision*, 569 F.3d 514, 519 (D.C. Cir. 2009).

Finally, we disagree with Industry Petitioners that the Act's legislative history shows Congress intended EPA to make factual findings before calling a SIP, even when the SIP's inadequacy is a legal shortcoming discernible from the text of the statute and the SIP itself. Industry Petitioners rely on a Senate report from 1970 that describes EPA's job to "find[] from new information developed after a plan is approved that the plan is not or will not be adequate to achieve promulgated ambient air quality standards" and "notify the appropriate

States and give them an opportunity to respond to the new information." Ind. Pet. Br. at 31-32 (emphasis omitted) (quoting S. REP. NO. 91-1196, at 55-56 (1970)). That report has little relevance here and, in any case, does not support Petitioners' argument. It speaks to the first ground for issuing a SIP Call, *i.e.*, where a SIP is substantially inadequate "to attain or maintain the relevant national ambient air quality standard." 42 U.S.C. § 7410(k)(5). The report does not address EPA SIP Calls under the third ground for failure to "comply with any requirement" of the Act, *id.*; indeed, in 1970 when the report was written, the Act did not yet include the third ground for a SIP Call. Only in 1977 did Congress expand section 7410(a)(2)(H)(ii) to recognize that a SIP may be substantially inadequate to otherwise comply with the Act's legal requirements. *See* Clean Air Act Amendments of 1977, Pub. L. No. 95-95, § 108(a)(6)(A), 91 Stat. 685, 693-94. And only in 1990 did Congress codify the section 7410(k)(5) SIP-call authority. *See* Clean Air Act Amendments of 1990, Pub. L. No. 101-549, § 101(c), 104 Stat. 2399, 2407. Even if that legislative history were relevant, it is not nearly as illuminating as Petitioners make it out to be. As EPA recognized, the legislative history does not require Industry Petitioners' reading of "find" or "information" any more than does the statute itself. *See* 80 Fed. Reg. at 33,935/1.

In sum, we hold that when EPA calls a SIP for a substantial legal inadequacy, it need only identify the deficiency and explain why it is substantial. Whether a SIP is "substantially inadequate" to comply with the Act may depend on the particular circumstances of the SIP Call at issue, including the nature of the Clean Air Act provisions the SIP violates, as well as the extent of its noncompliance. We further hold that the Act does not categorically require EPA, when calling a SIP for a substantial legal inadequacy, to make specific factual findings of actual or projected harm to the Act's objectives as

a result of that deficiency. In so holding, we note that the Tenth Circuit came to a similar conclusion in *U.S. Magnesium, LLC v. EPA*, 690 F.3d 1157 (10th Cir. 2012). There, the court explained that because section 7410(k)(5) "says nothing about whether the agency is required to make a specific factual finding" before calling a SIP, EPA reasonably interpreted its authority not to require factual findings when calling a SIP for failure to comply with the Act's legal requirements. *Id.* at 1167; *see id.* at 1167-68. In reaching a similar bottom line, we see no need to resort to deference. The statute itself is clear: Factual findings about the knock-on effects of a SIP's deficiencies are not categorically required when EPA calls a SIP for substantial inadequacies to comply with the Act.

B.

We next consider Industry Petitioners' assertion that EPA cannot base a SIP Call on legal deficiencies in specific SIP provisions so long as the SIP "as a whole" is adequate to comply with the Act. We conclude that we need not decide whether section 7410(k)(5) requires EPA to review SIPs "as a whole," because even if EPA were subject to such a requirement, the agency clearly satisfied it here.

Industry Petitioners seem to argue that EPA cannot object to particular SIP provisions, even if inconsistent with the Act's explicit requirements, so long as the SIP as a whole ultimately complies with the NAAQS. To the extent this argument reprises Petitioners' contention that EPA must make factual findings about a SIP's overall effectiveness in attaining the NAAQS before calling it, we have already explained why no such factual findings are necessary when EPA calls a SIP for substantial legal inadequacies. *See* pp. 14-25, *supra*. In any event, Petitioners' argument is belied by the text of section 7410(k)(5). Recall that section 7410(k)(5) identifies three

distinct grounds for calling a SIP. Congress expressly recognized that some SIPs might be deficient in ways that interfere with the NAAQS and thus could be called under the first ground, or that fail to curtail interstate pollution and so could be called under the second. Acknowledging, however, that SIPs can be substantially inadequate in other ways, Congress conferred on EPA the third type of SIP-call authority, the power to call SIPs that are "otherwise" legally deficient. 42 U.S.C. § 7410(k)(5). Requiring EPA to demonstrate adverse effects on the NAAQS for *all* SIP Calls—even those under the third ground—would contravene the plain text of section 7410(k)(5) and would render the third ground surplusage.

Industry Petitioners further claim that EPA overlooked other provisions in the called SIPs that bring the SIPs "as a whole" into compliance with the Act's enforcement scheme and its specification of continuous emission limitations. In particular, commenters pointed to SIP provisions that confer a "general duty" on sources to limit emissions at all times, including during SSM periods. Those general-duty provisions, Petitioners argue, resolve any perceived violations of the Act's requirements vis-à-vis emission limitations. Setting aside whether those general-duty provisions satisfy the Act's definition of emission limitation, *see Sierra Club*, 551 F.3d at 1027-28, the record demonstrates that EPA did in fact consider those general-duty provisions, *see* 80 Fed. Reg. at 33,889/1-90/1, 33,903/1-04/2, 33,979/3-80/1; *see also* EPA Br. at 68-84, 129-31. The agency explained in detail why, in its view, the general-duty provisions failed to bring the SIPs into compliance. *See* 80 Fed. Reg. at 33,903/1-04/2. On appeal, Petitioners do not cite any other SIP provisions they claim EPA overlooked and that they assert obviate the need for a SIP Call. Thus, whether or not EPA was required to consider the SIPs "as a whole," it plainly did so.

C.

State Petitioners argue that EPA impermissibly called SIPs to address ambiguous SIP provisions—that is, provisions that could be read as incompatible with the requirements of the Clean Air Act. According to State Petitioners, ambiguous provisions have only the "mere *potential* for" inadequacy. State Pet. Br. at 19. Thus, say the states, EPA has arbitrarily lowered the standard for calling SIPs from "substantial[] inadequa[cy]" to potential substantial inadequacy. For its part, EPA explained that ambiguous SIPs undermine the Act's effectiveness: Because ambiguous provisions leave the regulated community, public, regulators, and courts uncertain as to what the SIP does—and does not—require, such provisions dilute the Clean Air Act's compliance requirements and enforcement scheme. *See* 80 Fed. Reg. at 33,885/1-2, 33,886/2, 33,926/3-27/1. In other words, the inadequacy is not merely "potential" because lack of clarity on its own hinders enforcement.

We reject Petitioners' claims that ambiguity cannot support a SIP Call. Nothing in section 7410(k)(5) requires substantial inadequacies to be unambiguous. Rather, consistent with the Tenth Circuit's decision in *U.S. Magnesium*, we conclude that section 7410(k)(5) empowers EPA to call SIPs to clarify language that may be read to violate the Act. *See* 690 F.3d at 1169-70. By calling SIPs for ambiguous provisions, EPA fulfills its role within the statutory scheme. Congress charged EPA with ensuring that SIPs meet the requisites of the Clean Air Act and fulfill the Act's purpose of improving air quality. *See* 42 U.S.C. § 7410(k)(5); *id.* § 7410(k)(3); *id.* § 7410(*l*); *see generally id.* §§ 7401, 7410(a)(2). Ambiguous SIP provisions leave unclear what regulated parties must do to conform to the SIP's requirements and hamstring EPA in its efforts to police compliance with the

Act. As the agency observed, if EPA is "unable to ascertain" what a SIP provision requires, then courts, regulated entities, and the public "will have the same problem." 80 Fed. Reg. at 33,943/3. By seeking clarification or revision of ambiguous SIP provisions, EPA dispels any uncertainties as to the SIP's demands, enabling SIP provisions to fulfill their role in achieving the mandates of the Clean Air Act.

State Petitioners advance a distinct argument against EPA's stance on ambiguous provisions. EPA's position is especially vexing, they say, because EPA will not consider states' *post hoc* interpretive letters—*i.e.*, letters submitted after EPA's approval of the SIP—to clarify ambiguous provisions. *See id.* at 33,888/1. Instead, if states wish to rely on interpretive letters to cure material ambiguities in their SIPs, EPA requires that the letters be provided during notice and comment. That ensures that EPA approval rests on a shared EPA and state understanding, appropriately memorialized in the public rulemaking docket. *Id.* at 33,885/2-88/3. Whatever its merit, EPA's decision not to rely on after-the-fact interpretive letters to resolve any ambiguity in SIPs is beside the point: Petitioners did not challenge in the period for public comment EPA's policy against reliance on *post hoc* interpretive letters. *See id.* at 33,887/1-9/1.

Thus, under section 7410(k)(5), if EPA reasonably determines that a SIP provision could reasonably be understood to conflict with the Act, that can suffice to warrant a finding of substantial inadequacy.

## D.

Last, Industry Petitioners maintain that EPA did not fulfill its duty to consider the economic costs and benefits of the SIP Calls. They assert that a finding of "substantial[] inadequa[cy]" requires consideration of costs and benefits, and

that EPA's decision not to carry out such an analysis necessarily renders the Final Action arbitrary and capricious. According to Petitioners, EPA should have evaluated not just the "direct costs" to states of editing the violative SIP provisions, *see* 80 Fed. Reg. at 33,883/3-84/2, but also the costs to revise other portions of their SIPs that refer to the violative provisions and/or to create new, compliant emission rules, as well as the cost to industry to meet revised SIP provisions.

Contrary to EPA's contention, Industry Petitioners timely objected during the period for public comment to EPA's lack of cost-benefit analysis. Several commenters critiqued EPA for failing to conduct a cost-benefit analysis and cautioned that the SIP Calls would impose outsized costs on states and industry without commensurate benefits. *See* SSM Coalition Comments, J.A. 598 ("EPA failed to perform such an assessment of the costs and benefits."), 595 ("EPA Unlawfully Failed To Assess the Undoubtedly High Costs the Proposed SIP Calls Would Impose on States and Regulated Sources . . . The SIP Call Notice is totally lacking in any analysis of what this EPA action would cost the states, stationary sources, and the public."), 579 ("The SIP Call Notice would impose tremendous resource demands . . . and costly new constraints on [source] operations."), 580 ("The proposed SIP Calls would impose huge administrative burdens on state agencies, as well as significant costs for regulated facilities, without any clear environmental benefit."); Southern Company Comments, J.A. 506-12 (section titled "EPA Has Arbitrarily and Capriciously Failed To Consider the Significant Cost, Technical, and Operational Burden of This Rule"). Because Petitioners objected "with reasonable specificity during the period for public comment," we consider their objections. 42 U.S.C. § 7607(d)(7)(B).

Contrary to Industry Petitioners' contention, however, section 7410(k)(5) does not impose an across-the-board obligation on EPA to quantify and weigh costs and benefits before calling a SIP. In calling for cost-benefit analysis, Industry Petitioners principally rely on *Michigan v. EPA*, 576 U.S. 743 (2015). Michigan and other states challenged EPA's disregard of costs when the agency first considered whether to regulate power plants' emissions of hazardous air pollutants under Clean Air Act section 112. *Id.* at 750. Interpreting section 112's instruction that the agency regulate power plants only if it found such regulation "appropriate and necessary," 42 U.S.C. § 7412(n)(1)(A), the Supreme Court held that EPA had unreasonably ignored costs in its threshold determination whether to regulate. *Michigan*, 576 U.S. at 753. The Court reasoned that the word "appropriate" was the "classic broad and all-encompassing term that naturally and traditionally includes consideration of all the relevant factors," including cost. *Id.* at 752. Because cost is a "centrally relevant factor when deciding whether to regulate," it was unreasonable under the circumstances to read the phrase "'appropriate and necessary' as an invitation to ignore cost." *Id.* at 752-53. Furthermore, in section 112, there was an express statutory directive for EPA to study "the costs of [available] technologies" to control hazardous mercury emissions from power plants. 42 U.S.C. § 7412(n)(1)(B). That statutorily mandated consideration of cost bolstered the *Michigan* Court's decision that EPA was required to conduct a cost-benefit analysis under the circumstances presented there. 576 U.S. at 753. Even as it recognized a cost-benefit analysis requirement in that context, however, the Court acknowledged that "[t]here are undoubtedly settings in which the phrase 'appropriate and necessary' does not encompass cost." *Id.* at 752.

Seeking support from *Michigan*, Petitioners insist the phrase "substantially inadequate" signals the need for cost-

benefit analysis, just as the phrase "appropriate and necessary" did with respect to EPA's decision whether to regulate certain hazardous air pollutants. That analogy proves too much. Unlike the provision at issue in *Michigan*, section 7410(k)(5) does not prompt EPA to consider all relevant factors (including cost). To the contrary, section 7410(k)(5) puts significant bounds on EPA's duty to call a SIP. For starters, EPA is neither required nor authorized to call a SIP whenever the agency decides it would be "appropriate and necessary" to do so. Instead, to call a SIP, EPA must determine it to be substantially inadequate—that is, materially deficient. *See* pp. 16-18, *supra*. And not every substantial inadequacy suffices: The inadequacy must also be on one of three statutorily defined grounds. *See* 42 U.S.C. § 7410(k)(5).

None of the other considerations in *Michigan* has any bearing on this challenge to EPA's SIP-call authority. Unlike section 112, the provisions governing EPA's SIP Call authority contain no "express reference to cost." *Michigan*, 576 U.S. at 753. Nor is EPA's duty to call for revision of a substantially inadequate SIP akin to the agency action at issue in *Michigan* of "first deciding *whether* to regulate" an industry's hazardous emissions. *Id.* at 756. Far from it. By the time a SIP Call occurs, EPA has already identified air pollutants that endanger public health and welfare and has promulgated the NAAQS, 42 U.S.C. §§ 7408-09; states have already submitted SIPs as required to meet the NAAQS, *id.* § 7410(a)(1), and other obligations of the Act; EPA has already approved those plans, *id.* § 7410(k)(3)-(4); and states may have even revised those plans with further EPA approval, *id.* § 7410(*l*).

The cooperative federalism required by the Clean Air Act makes it especially anomalous in the SIP-call context to read an implied cost-benefit mandate into the statutory authorization for EPA to call a substantially inadequate SIP. When calling a

SIP, EPA cannot dictate, or even predict, the particular measures states will adopt to rectify the SIP's deficiencies. 80 Fed. Reg. at 33,883/3; *see Train*, 421 U.S. at 78-79; *Virginia*, 108 F.3d at 1409-10, 1414-15. In response to the SIP Calls under review, for instance, states might decide to remove legally deficient provisions. Or they could adopt alternative numerical emission limits. Or perhaps they would seek to put in place technological controls or work practices. Or they might refashion their applicable emission rules altogether. *See* 80 Fed. Reg. at 33,974/2-82/2. Requiring consideration of costs in every SIP Call would thus upset the federal-state balance Congress established in the Clean Air Act. Because the states retain broad discretion in crafting SIP provisions so long as they comply with the Act, balancing the benefits and burdens of a particular SIP revision is best left to the state agency tasked with revising the implementation plan. After all, "[p]erhaps the most important forum for consideration of claims of economic and technological infeasibility is before the state agency formulating the implementation plan." *Union Elec. Co.*, 427 U.S. at 266.

That said, nothing in our decision prevents EPA from choosing to consider costs to the extent feasible and not prohibited by the Act. *See Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 222-26 (2009); *see also Michigan*, 213 F.3d at 674-79. We hold only that section 7410(k)(5) does not invariably require EPA to assess costs and benefits when calling SIPs for failure to comply with the Act's legal requirements. EPA's decision not to do so here is no ground for invalidating the challenged action.

## II.

In addition to Petitioners' overarching challenges to EPA's statutory authority to call the SIPs at issue, Petitioners also

more particularly challenge EPA's decision to call four specific categories of SIP provisions: (1) automatic exemptions, (2) director's discretion provisions, (3) overbroad enforcement discretion provisions, and (4) affirmative defense provisions. We now take up those specific challenges.

With respect to automatic exemptions and director's discretion provisions, we agree with Petitioners and set aside the SIP Calls insofar as they rest on those provisions. With respect to overbroad enforcement discretion provisions, we reject that challenge and uphold EPA's Final Action. And with respect to affirmative defense provisions, we agree with Petitioners as to certain types of affirmative defense provisions but reject Petitioners' challenge as to other types.

A.

We first consider automatic exemptions. We cannot sustain EPA's rationale for concluding that automatic exemptions are substantially inadequate to comply with the CAA. *See* 42 U.S.C. § 7410(k)(5). We thus vacate the SIP Calls insofar as they are predicated on that conclusion.

1.

Automatic exemptions exclude SSM periods from otherwise applicable emission restrictions. In calling SIPs on the basis that they contain automatic exemptions, EPA relied on its authority to call SIPs that are "substantially inadequate to . . . comply with any requirement of [the CAA]." *Id.*

The centerpiece of EPA's belief that automatic exemptions violate a requirement of the CAA is that, by excluding SSM periods from an emission restriction, an automatic exemption impermissibly renders the limitation discontinuous. The agency's analysis proceeds in three steps.

First, EPA starts with the premise that it "interprets CAA sections 110(a)(2)(A) and 110(a)(2)(C) [*i.e.*, 42 U.S.C. §§ 7410(a)(2)(A) and (C)] to require that SIPs contain 'emission limitations.'" State Implementation Plans, 80 Fed. Reg. at 33,927/2. Second, EPA reasons that the "emission limitations" that SIPs ostensibly must contain are defined by the CAA as restrictions that apply on a "continuous" basis. *Id.* (citing 42 U.S.C. § 7602(k), which defines "emission limitation"). Third, EPA concludes that, because automatic exemptions from "otherwise applicable emission limitations" render limitations "less than continuous" in that they need not apply during SSM periods, automatic exemptions are "inconsistent with a fundamental requirement of the CAA"— *i.e.*, the statute's definition of an "emission limitation" as a "continuous" measure. *Id.*

That rationale begins with—and rests on—an essential premise at the first step: that SIPs must contain "emission limitations." From that premise, EPA builds its argument that: (a) The CAA defines an "emission limitation" as a measure that operates "on a continuous basis," 42 U.S.C. § 7602(k); and (b) automatic exemptions conflict with the CAA because they render an emission limitation discontinuous, contravening the statutory definition of "emission limitation." Even if we assume the correctness of the last step of the analysis—*i.e.*, that an automatic exemption renders a given measure incompatible with the statutory definition of "emission limitation"—EPA's rationale breaks down if the measure need not qualify as an "emission limitation" in the first place. In that event, the fact that the statute defines an "emission limitation" as operating "on a continuous basis," *id.*, would not matter: If the measure in question need not qualify as an "emission limitation," then it need not satisfy the CAA's definition of an "emission limitation" (including the requirement that it apply "on a continuous basis").

A great deal turns, then, on EPA's starting premise that SIPs invariably must contain "emission limitations."  Indeed, because EPA views automatic exemptions to be inconsistent with the CAA as a categorical matter, and because the agency thus called *every* automatic exemption in *any* SIP, the essential premise of EPA's Final Action is still broader:  The premise is not just that SIPs must contain "emission limitations," but that *every* emission restriction in a SIP that is subject to an automatic exemption (and hence was called by EPA) must qualify as an "emission limitation."

What is the basis for that essential premise of EPA's rationale for calling automatic exemptions as a blanket matter?  In its brief, EPA at one point states, without elaboration, that "[i]t is indisputably a 'requirement[] of this chapter' that SIPs include 'enforceable emission limitations.'"  EPA Br. 48-49 (quoting 42 U.S.C. § 7410(a)(2)(A)).  That assertion, it bears noting, does not even purport to support the full breadth of the essential premise of EPA's categorical call of automatic exemptions—*i.e.*, that *every* emission restriction in a SIP that is subject to an automatic exemption must qualify as an "emission limitation."  At any rate, even on the narrower question whether SIPs must include at least *some* "emission limitations," that assertion in EPA's brief still falls short.

In stating that it "is indisputably a 'requirement[] of this chapter' that SIPs include 'enforceable emission limitations,'" *id.*, EPA quotes from and relies upon 42 U.S.C. § 7410(a)(2)(A).  As Petitioners emphasize, though, that provision does not state that any SIP, no matter the circumstances, must include "emission limitations." Rather, it states that a SIP "shall—

(A) include enforceable emission limitations and other control measures, means, or techniques . . . , as

> well as schedules and timetables for compliance, *as may be necessary or appropriate* to meet the applicable requirements of this chapter."

42 U.S.C. § 7410(a)(2)(A) (emphasis added). The only "enforceable emission limitations" that must be included in a SIP, then, are those that "may be necessary or appropriate" to enable the state "to meet the applicable requirements of this chapter [*i.e.*, the CAA]." *Id.* Or, as Petitioners articulate the point: "[R]egardless of what 'emission limitation' means, Congress explicitly provided states discretion to impose them *only as 'necessary or appropriate'* to meet some other applicable requirement of the CAA." Ind. Pet. Br. 49 (emphasis added) (citing 42 U.S.C. § 7410(a)(2)(A)).

Put in the alternative, if it is *not* "necessary or appropriate" that a given measure qualify as an "emission limitation" to enable a state "to meet the [CAA's] applicable requirements," the measure can be included in a SIP even if it does not meet the CAA's definition of an "emission limitation." Indeed, the plain terms of section 7410(a)(2)(A) specifically allow for inclusion in a SIP of measures other than "enforceable emission limitations": The provision states that, in addition to "enforceable emission limitations," a SIP can also "include . . . *other* control measures, means, or techniques" as "may be necessary or appropriate to meet [the CAA's] requirements." *Id.* (emphasis added). So, even if a given emission restriction does not qualify as an "emission limitation" under the CAA—including, for instance, because it does not operate on a "continuous basis," *id.* § 7602(k)—it could still be part of a SIP. And EPA would lack authority to call such a measure solely on the ground that it fails to meet the statutory definition of an "emission limitation"—a definition it did not need to satisfy.

To illustrate the point, consider a hypothetical example of a state that submits a SIP containing various measures, some of which restrict emissions but none of which satisfies the CAA's definition of "emission limitation." Under section 7410(a)(2)(A), as noted, the SIP must "include enforceable emission limitations and other control measures, means, or techniques . . . as may be necessary or appropriate to meet the [CAA's] applicable requirements." *Id.* § 7410(a)(2)(A). The most prominent "applicable requirements" are the NAAQS. *See id.* § 7410(a)(1). Suppose that the state concludes it can satisfy the NAAQS for a given pollutant through its particular combination of other types of control measures (and without any "emission limitations," as defined by 42 U.S.C. § 7602(k)). The state might then consider that mix of "other control measures" to be "necessary or appropriate" to meet the NAAQS. *Id.* § 7410(a)(2)(A).

In that situation, EPA could not call the SIP solely on the ground that the SIP's "other control measures" fail to satisfy the statutory definition of an "emission limitation." Even if so, the SIP may still "include . . . other control measures . . . as [are] necessary or appropriate to meet the [CAA's] applicable requirements." *Id.* Indeed, EPA acknowledged at oral argument that the agency could as a conceptual matter approve "a SIP that doesn't include an emission limitation at all," so long as that SIP still "would then meet [the] requirements of the Clean Air Act." Oral Arg. 1:34:40-1:34:53.

To be sure, EPA could determine that the hypothetical state is *wrong* in concluding that its chosen mix of "other control measures" is "necessary or appropriate" to meet the NAAQS. If so, EPA might decide that, for the state to meet the NAAQS, at least one of the "other control measures" must be adjusted such that it satisfies the definition of an "emission limitation"—including, for instance, by converting it from a

discontinuous to a continuous measure. And EPA could call the SIP on that basis.

But EPA, in that event, would not rest its SIP Call solely on the ground that the SIP's "other control measures" do not satisfy the statutory definition of an "emission limitation." Rather, EPA would rely on its determination that, for the state to *meet the NAAQS*, it is "necessary or appropriate" that one of the SIP's measures be converted from a non-"emission limitation" to an "emission limitation." EPA's SIP-call authority, that is, would be predicated on that kind of "necessary or appropriate" determination. Here, though, EPA made no such finding that, for a state to meet the NAAQS (or satisfy some other pertinent requirement of the Act), it is "necessary or appropriate" for the SIP measures subject to automatic exemptions instead to operate during SSM periods.

Our dissenting colleague protests that the hypothetical example of a state whose SIP contains no provisions satisfying the statutory definition of "emission limitation" has never in fact happened in the real world. Dissenting Op. 22. That may well be so; no one contends otherwise. The purpose of the hypothetical example is simply to illustrate that, insofar as such a SIP runs afoul of the statute, it would be because including measures satisfying the statutory definition of "emission limitation" is "necessary or appropriate" to enable the state to meet the NAAQS or some other CAA requirement. 42 U.S.C. § 7410(a)(2)(A). It would *not* be merely because the SIP's emission restrictions fail to fit within the statutory definition of "emission limitation," without regard to the implications for complying with the Act's requirements.

Our colleague posits two reasons, apart from the statutory definition, that EPA might believe a SIP's emission restrictions must apply during SSM periods (and thus cannot be subject to

automatic exemption provisions). Neither reason she puts forward, however, can possibly justify EPA's blanket call of automatic exemptions in this case. EPA does not (and could not) claim otherwise.

Our colleague first surmises that automatic exemptions from SSM periods "undercut states' ability to meet Clean Air Act requirements, such as attaining and maintaining the NAAQS." Dissenting Op. 5. If that were so, and if EPA reasonably so concluded, we agree that EPA could call a SIP on that basis. EPA, though, never made any such determination and does not purport to have done so—indeed, that is exactly the problem with EPA's blanket call of automatic exemption provisions. EPA instead relied on a supposed obligation to satisfy the statutory definition of an "emission limitation"—which, for the reasons explained, is not itself a requirement of the Act for the emission restrictions in a SIP. Rather, those measures must operate during SSM periods only if it is "necessary or appropriate" for them to do so to enable the state to meet the NAAQS (or comply with the Act's other pertinent requirements). 42 U.S.C. § 7410(a)(2)(A).

Second, according to our colleague, automatic exemptions tend to frustrate accurate tracking of emissions because monitoring generally assumes a source's compliance at all times. Dissenting Op. 5-6. The resulting "inaccuracies in emission inventories," our colleague submits, "distort[] strategies for attaining the NAAQS and downstream modeling of NAAQS attainment." *Id.* at 6. Again, though, EPA did not rely on that explanation to justify its blanket call of automatic exemptions. Quite the opposite: EPA reviewed that precise theory, deemed it an "oversimplification," and expressly declined to rest the SIP Calls on "how SSM exemptions may or may not negatively impact things like emissions inventories." 80 Fed. Reg. at 33,950/1.

Where does this leave us with respect to EPA's across-the-board call of automatic exemption provisions in this case? EPA's authority to call a SIP is conditioned on the agency's finding that the SIP is "substantially inadequate to attain or maintain the relevant [NAAQS] . . . or to otherwise comply with any requirement of" the CAA. 42 U.S.C. § 7410(k)(5). And here, EPA premised its call of automatic exemption provisions on section 7410(a)(2)(A)'s reference to "emission limitations" when setting out what a SIP must include. *See* 80 Fed. Reg. at 33,927/2. For EPA to justify its call of every automatic exemption based on that provision, the agency would need to find that, to enable a state to meet the NAAQS or some other "applicable requirement[]," it is "necessary or appropriate" that emission restrictions subject to automatic exemptions satisfy the statutory definition of an "emission limitation." 42 U.S.C. § 7410(a)(2)(A). As a result, EPA cannot ground its blanket call of automatic exemptions on section 7410(a)(2)(A)'s specification that SIPs must "include enforceable emission limitations" in certain situations (when "necessary or appropriate to meet the [CAA's] applicable requirements"). 42 U.S.C. § 7410(a)(2)(A). The agency did not make—and does not purport to have made—the predicate "necessary or appropriate" determination with respect to *any* automatic exemption, much less to *all* automatic exemptions as a class.

To be sure, EPA grounds its authority to call automatic exemption provisions not just in section 7410(a)(2)(A) but also in section 7602(k), the CAA's definition of "emission limitation." The latter provision, though, does not say anything about *when* a SIP must include an "emission limitation." Rather, it defines an "emission limitation" as a measure "which limits the quantity, rate, or concentration of emissions of air pollutants on a continuous basis," 42 U.S.C. § 7602(k), without speaking to the antecedent question of when such a measure

must be part of a SIP.  That question instead is addressed in section 7410(a)(2)(A), which, again, requires a SIP to include an "emission limitation[]" only when it is "necessary or appropriate to meet the [CAA's] applicable requirements."  42 U.S.C. § 7410(a)(2)(A).

For that reason, EPA's reliance on *Sierra Club v. EPA*, 551 F.3d 1019, is misplaced.  In that case, we considered 42 U.S.C. § 7412(d)(1), which requires EPA to "establish[] emission standards" for certain sources and pollutants.  The CAA gives "emission standard" the same definition as "emission limitation."  42 U.S.C. § 7602(k) ("The terms 'emission limitation' and 'emission standard' mean a requirement . . . which limits the quantity, rate, or concentration of emissions of air pollutants on a continuous basis . . . .").  In *Sierra Club*, we held that EPA's establishment of an SSM exemption for an "emission standard" was inconsistent with the definition's requirement that an emission standard "be continuous."  551 F.3d at 1027-28.  EPA submits that, in this case, automatic exemptions for SSM periods are likewise inconsistent with the definition of "emission limitation[]" and so should also be deemed invalid.

The relevant provision in *Sierra Club*, however, simply required EPA to "establish[] emission standards," 42 U.S.C. § 7412(d)(1), without any proviso conditioning that obligation on a predicate determination that it is "necessary or appropriate" for a measure to qualify as an "emission standard."  As a result, every measure established by EPA under that provision needed to qualify as an "emission standard," including by satisfying the requirement that the measure operate on a "continuous basis."  There are also other provisions that likewise require the use of "emission limitations" without condition.  *See, e.g.*, 42 U.S.C. § 7429(a)(1)(A) (requiring EPA to establish performance

standards for solid waste incineration units and stating that "[s]uch standards *shall* include emission limitations" (emphasis added)).

Here, by contrast, a SIP must include "emission limitations" only when "necessary or appropriate to meet the [CAA's] applicable requirements." 42 U.S.C. § 7410(a)(2)(A). And EPA has not purported to find that it is "necessary or appropriate" for every (or indeed any) emission restriction subject to an automatic exemption to qualify as an "emission limitation" under the statutory definition.

Our dissenting colleague stresses that the emission restrictions at issue meet at least part of the definition of "emission limitation" in that they limit "the quantity, rate, or concentration of emissions." Dissenting Op. 10, 20 (quoting 42 U.S.C. § 7602(k)). And because they meet part of the definition, she suggests, they must satisfy the rest of the definition too, by limiting emissions "on a continuous basis." *Id.* (quoting 42 U.S.C. § 7602(k)). That view could in theory have some purchase if the two relevant types of emission restrictions referenced in section 7410(a)(2)(A)—"emission limitations" and "control measures"—were mutually exclusive, such that a limit on "the quantity, rate, or concentration of emissions" could fit only in the former category. If so, such a limit perhaps would need to meet every part of the definition of "emission limitation," or else it would be neither an "emission limitation" nor a "control measure." But the statute makes plain that "emission limitations" are a *subset* of "control measures," not an entirely distinct category. *See* 42 U.S.C. § 7410(a)(2)(A) (referring to "emission limitations and *other* control measures") (emphasis added). The statute thus contemplates restrictions satisfying only part of the definition of "emission limitation": Such measures, even if not "emission limitations," can be "control measures."

In the SIP Calls, but not in its brief in our court, EPA sought to ground its authority to call automatic exemptions in one additional provision: 42 U.S.C. § 7410(a)(2)(C). *See* State Implementation Plans, 80 Fed. Reg. at 33,927/2 ("Automatic exemptions from otherwise applicable emission limitations thus render those limits less than continuous as required by CAA sections 302(k), 110(a)(2)(A) *and 110(a)(2)(C)* . . . ." (emphasis added)). That provision does not help the agency. It requires SIPs to "include a program to provide for the enforcement of the measures described in subparagraph (A)," *i.e.*, section 7410(a)(2)(A). 42 U.S.C. § 7410(a)(2)(C). While section 7410(a)(2)(C) thus calls for SIPs to provide for the "enforcement of the measures" that must be included in a SIP under section 7410(a)(2)(A), it does not address which measures must be contained in a SIP in the first place. That instead is the office of section 7410(a)(2)(A), which requires a SIP to include only those measures that are "necessary or appropriate to meet the [CAA's] applicable requirements." 42 U.S.C. § 7410(a)(2)(A).

In the end, then, EPA's authority to issue a blanket call of automatic exemptions must be supported by the terms of section 7410(a)(2)(A). And because reliance on that provision, under the provision's plain terms, is conditioned on a "necessary or appropriate" determination that EPA has not made, the agency's call of automatic exemptions must be set aside.

### 2.

EPA in varying measure floats two alternative reasons for why it ostensibly could call automatic exemptions without having to make any "necessary or appropriate" determination under section 7410(a)(2)(A): (i) The "necessary or appropriate" condition in that provision in fact does not apply

to "emission limitations" at all; or (ii) EPA had already made any required "necessary or appropriate" finding when initially approving the SIPs. Neither of those theories withstands scrutiny.

a.

In its briefing in this case, EPA nowhere disputes that, under the text of section 7410(a)(2)(A), SIPs must "include enforceable emission limitations" only "as may be necessary or appropriate to meet the [CAA's] applicable requirements." 42 U.S.C. § 7410(a)(2)(A). That is, EPA does not contest that, per the language of the provision, the "necessary or appropriate" condition applies to "enforceable emission limitations." True, EPA, as explained, issued its blanket call of automatic exemptions without making the requisite "necessary or appropriate" determination. But with respect to construing the *language* of section 7410(a)(2)(A), EPA's briefing does not dispute that the words "as may be necessary or appropriate" modify "enforceable emission limitations."

In fact, EPA explains in its brief that, "under section 7410(a)(2)(A), each SIP must contain enforceable emission limitations *as necessary to meet all applicable CAA requirements*." EPA Br. 36-37 (emphasis added). And in the Final Action itself, EPA expressly acknowledged that section 7410(a)(2)(A) "means that a SIP must . . . contain legitimate, enforceable emission limitations *to the extent they are necessary or appropriate* 'to meet the applicable requirements' of the Act." State Implementation Plans, 80 Fed. Reg. at 33,879/2 (emphasis added) (quoting 42 U.S.C. § 7410(a)(2)(A)).

In another part of the SIP Calls, moreover, EPA responded to comments supposing that the agency espoused a contrary interpretation of section 7410(a)(2)(A) under which "the

statutory phrase 'as may be necessary' only qualifies what 'other control[s]' are required rather than also qualifying what emission limitations are required." *Id.* at 33,902/1-2. Under such an interpretation, in other words, the "necessary or appropriate" clause would modify "other control measures, means, or techniques," but would not trace back to also modify "enforceable emission limitations." 42 U.S.C. § 7410(a)(2)(A).

EPA, though, did not accept the commenters' understanding of the agency's interpretation, instead referring to it only as "EPA's *purported* interpretation." State Implementation Plans, 80 Fed. Reg. at 33,902/1 (emphasis added). And in EPA's response to those comments, the agency acted on an understanding that "necessary or appropriate" *does* modify "enforceable emission limitations," and sought to explain why its call of automatic exemptions should be upheld anyway (an explanation we consider and reject below, *see* Part II.A.2.b, *infra*). *Id.* at 33,902/2-3. For the most part, then, EPA accepts that under a straightforward reading of the terms of section 7410(a)(2)(A), the "necessary or appropriate" clause applies to "enforceable emission limitations."

In a response to a comment elsewhere in the SIP Calls, however, the agency put forward an explanation that appears to rest implicitly on a contrary reading of section 7410(a)(2)(A) under which the "necessary or appropriate" clause modifies only "other control measures, means, or techniques," not "enforceable emission limitations." The comment contended that when an emission restriction in a SIP is subject to an SSM exemption, section 7410(a)(2)(A) still allows the measure to be included in a SIP as an "other control measure[]," even if it does not qualify as an "emission limitation[]" due to its discontinuity. *See* State Implementation Plans, 80 Fed. Reg. at 33,896/1. EPA rejected that possibility, reasoning that its logic

would "theoretically allow a SIP to contain no emission limitations whatsoever." *Id.* at 33,896/3. EPA then observed: "This result is contrary to judicially approved EPA interpretations of prior versions of the CAA as requiring all SIPs to include continuously applicable emission limitations and only requiring 'other' additional controls 'as may be necessary' to satisfy the NAAQS." *Id.* at 33,896/3-33,897/1.

That observation references an interpretation of a "prior version[]," *id.*, of section 7410(a)(2)(A) under which the words "as may be necessary" were construed to modify only "other control measures" and not to modify "emission limitations." Consistent with such an understanding, EPA supported its observation by citing an opinion that had adopted such an interpretation of section 7410(a)(2)(A)'s predecessor. *Id.* at 33,897/1 n.175 (citing *Kennecott Copper Corp. v. Train*, 526 F.2d 1149, 1153 (9th Cir. 1975)).

Even assuming that was the correct interpretation of the previous language, however, the language is materially different now. The prior version called for approval of a SIP if it "includes emission limitations, schedules, and timetables for compliance with such limitations, and such other measures as may be necessary to insure attainment and maintenance of [the NAAQS]." *Kennecott Copper*, 526 F.2d at 1153 (quoting 42 U.S.C. § 1857c-5(a)(2)(B) (1970)). The 1990 Clean Air Act Amendments changed the language in several ways, including by expanding the qualifying phrase "as may be necessary to" to "as may be necessary or appropriate to," and also by expanding the ensuing words from "insure attainment and maintenance of [the NAAQS]" to "meet the [CAA's] applicable requirements" (including but not limited to the NAAQS). 42 U.S.C. § 7410(a)(2)(A). And crucially for our purposes, the previous version linked its "necessary" clause more closely to "such other measures" by placing them in the

same clause while putting "emission limitations" in a separate clause, whereas the current version, exhibiting no such imbalance, links its "necessary or appropriate" clause with both "other control measures" and "emission limitations" to the same degree.

In particular, the previous version, as just noted, called for a SIP to "include[] emission limitations, . . . and such other measures as may be necessary to insure attainment" of the NAAQS. 42 U.S.C. § 1857c-5(a)(2)(B) (1970). Because the qualifying phrase "as may be necessary" appeared immediately after (and in the same clause as) "such other measures," whereas "emission limitations" appeared in a distinct, previous clause set off by a comma, the most natural reading was that "as may be necessary" modified only "such other measures," not "emission limitations." The result of that reading was that a SIP always needed to include "emission limitations" regardless of their necessity in achieving the NAAQS—*i.e.*, regardless of whether "other measures" could render an "emission limitation" unnecessary to achieve the NAAQS. *See Train*, 421 U.S. at 67. And a SIP therefore could contain "other measures" only if "emission limitations" could not attain the NAAQS on their own. *See id.*

The current provision, by contrast, sets off "as may be necessary or appropriate" in a separate clause from *both* "emission limitations" and "other control measures," while pairing the latter two in the same clause: Section 7410(a)(2)(A) now calls for SIPs to "include enforceable emission limitations and other control measures, . . . , as may be necessary or appropriate to meet the applicable requirements of [the CAA]." 42 U.S.C. § 7410(a)(2)(A). And when a qualifying phrase like "as may be necessary or appropriate" is set off by a comma in that manner from both "emission limitations" and "other control measures," the most natural reading is that the

qualifying phrase modifies both "emission limitations" and "other control measures," not just the latter. As the Supreme Court recently explained: A "qualifying phrase separated from antecedents by a comma is evidence that the qualifier is supposed to apply to all the antecedents instead of only to the immediately preceding one." *Facebook, Inc. v. Duguid*, 141 S. Ct. 1163, 1170 (2021) (quoting W. ESKRIDGE, INTERPRETING LAW: A PRIMER ON HOW TO READ STATUTES AND THE CONSTITUTION 67-68 (2016)).

In accordance with that reading, a SIP must include "emission limitations" only to the extent they are "necessary or appropriate to meet the [CAA's] applicable requirements." 42 U.S.C. § 7410(a)(2)(A). EPA does not dispute that interpretation to be the most natural reading of section 7410(a)(2)(A). Rather, EPA, in the referenced part of the SIP Calls, invokes only the legislative history, positing that the change from the prior to current versions of the statute sought merely to "combine and streamline" it rather than alter its meaning. 80 Fed. Reg. 33,897/1. But as explained, the amendments changed the relationship between the qualifying phrase and its potential objects, such that the "necessary or appropriate" clause in section 7410(a)(2)(A) is naturally (and best) read to modify "emission limitations." Indeed, as noted, EPA itself recognizes exactly that elsewhere in the SIP Calls. 80 Fed. Reg. 33,879/2 ("With respect to section 110(a)(2)(A), this means that a SIP must . . . contain legitimate, enforceable emission limitations *to the extent they are necessary or appropriate* 'to meet the applicable requirements' of the Act." (quoting 42 U.S.C. § 7410(a)(2)(A)) (emphasis added)). And EPA's brief in this case, we reiterate, says the same about the statutory language: "[U]nder section 7410(a)(2)(A), each SIP must contain enforceable emission limitations *as necessary to meet all applicable CAA requirements*." EPA Br. 36-37

(emphasis added). We agree with that straightforward reading of section 7410(a)(2)(A)'s terms.

Notably, our dissenting colleague nowhere advances any alternate interpretation of the statute's plain terms. That is unsurprising, as there is no sound way to read section 7410(a)(2)(A) other than to call for a SIP to include "emission limitations" only to the extent they are "necessary or appropriate to meet the [CAA's] applicable requirements." 42 U.S.C. § 7410(a)(2)(A). While our colleague offers no competing interpretation of the provision, she characterizes our straightforward reading of it (which is also EPA's own reading, as just noted) as "novel." Dissenting Op. 3, 19. Insofar as our colleague considers that reading to be "novel" in that it differs from the provision's previous understanding, that is because the statute has changed, as we have explained. Insofar as she deems that reading "novel" because, in her view, Petitioners have "never argued" for it "before us," Dissenting Op. 17, she is mistaken: As we set out below, Petitioners plainly argue that a SIP needs to include emission limitations only to the extent necessary or appropriate to meet the CAA's applicable requirements. *See* Part II.C, *infra*.

In fact, our colleague herself ultimately understands the changes to section 7410(a)(2)(A) to mean that the provision's "necessary or appropriate" clause now applies to "emission limitations," even if that was not previously the case. She emphasizes that, under the provision, states are charged with initially determining whether an "emission limitation" is "necessary or appropriate" to meet the CAA's applicable requirements. *See* Dissenting Op. 26. That of course is true, as the language of section 7410(a)(2)(A) sets out in enumerating what a state must include in its SIP. *See* 42 U.S.C. § 7410(a)(2)(A). But if states initially determine whether "emission limitations" are "necessary or appropriate" pursuant

to that provision, then the provision's "necessary or appropriate" condition necessarily applies to the words "emission limitations." In short, there is no plausible reading of the words "enforceable emission limitations and other control measures, means, or techniques . . . , as may be necessary or appropriate to meet the applicable requirements of this chapter" under which "as may be necessary or appropriate" modifies only "other control measures, means or techniques" without also modifying "emission limitations." *Id.*

b.

In the SIP Calls (but not in its brief in our court), EPA also maintained that it acted consistently with section 7410(a)(2)(A) even if the "necessary or appropriate" clause does modify "emission limitations." That argument is grounded in the idea that, when EPA initially approved the called SIPs, the agency considered measures it regarded as "emission limitations" to be "necessary" to meet the CAA's requirements. *See* 42 U.S.C. §§ 7410(a)(2)(A), (k)(3). EPA explains its reasoning this way: "In every state subject to this SIP call, the EPA has previously concluded in approving the existing SIP provisions that the emission limitations are necessary to comply with the legal requirements of the CAA." 80 Fed. Reg. 33,902/2.

But whatever may be the potential implications of EPA's initial approval of those so-called "limitations" in the SIPs, the SIPs also contained—and EPA thus also approved—the *exemptions* to those limitations. For instance, one of the states whose SIP was called for containing automatic exemptions is Delaware. And Delaware places its automatic exemptions directly alongside the corresponding emission restrictions. *See* 7-1100-1104 DEL. ADMIN. CODE § 1.5; 7-1100-1105 DEL. ADMIN. CODE § 1.7; 7-1100-1109 DEL. ADMIN. CODE § 1.4; 7-1100-1114 DEL. ADMIN. CODE § 1.3. As an example,

Delaware's emission restriction for "visible emissions" says that it "shall not apply to the start-up and shutdown of equipment" in specified circumstances, and then immediately sets forth the restriction to which the exemption applies—*i.e.*, "[n]o person shall cause or allow the emission of visible air contaminants or smoke from a stationary or mobile source, the shade or appearance of which is greater than 20% opacity for an aggregate of more than three minutes in any one hour or more than 15 minutes in any 24 hour period." 7-1100-1114 DEL. ADMIN. CODE §§ 1.3, 2.0.

Anyone reading those neighboring provisions (including, of course, EPA) would see that Delaware deems the emission restriction *as a whole*—the restriction as tempered by the immediately adjacent exemption—to be necessary to comply with the CAA. *See* 7-1100-1101 DEL. ADMIN. CODE § 3.2 (noting that "emission requirements are selected as minimum controls necessary to ensure a reasonable quality of air throughout the State"). And EPA thus approved those exemptions—no less than the restrictions to which they are attached—when it initially approved the SIPs. As a result, EPA's initial approval of the SIPs cannot now somehow justify leaving the so-called "limitations" in place but excising the interconnected exemptions. The agency approved *both* as an integrated unit.

That is true of all the automatic exemptions now called by EPA: EPA approved all those exemptions when it initially approved the associated restrictions. In that light, EPA cannot get very far by observing that it "previously concluded in approving the existing SIP provisions that the emission limitations are necessary to comply with [the] legal requirements of the CAA." 80 Fed. Reg. at 33,902/2. It necessarily also approved the exemptions to those "emission limitations."

Our dissenting colleague, though, says that we should just ignore the agency's approval of the exemptions because "EPA was rushing to approve the SIPs." Dissenting Op. 26. But to the extent that EPA rashly approved the exemptions in the SIPs because it was in too much of a hurry, that indictment of EPA's work would also apply to its approval of the *restrictions* in the same SIPs. Once again, there is no sound basis for leaving the restrictions in place on the theory that they were initially approved by the agency but nonetheless jettisoning the interconnected—and also-approved—exemptions.

At times in the SIP Calls, EPA additionally appears to nod at—but never ultimately advances—a somewhat related argument also rooted in the states' submission of the SIPs for EPA's approval. The idea is that the states' use of the term "emission limitations" to describe the emission restrictions in their SIPs had the effect of locking the states into satisfying the statutory definition of that term (including that an "emission limitation" operate "on a continuous basis," 42 U.S.C. § 7602(k)). *Cf.* 80 Fed. Reg. 33,879/3 ("Among [the CAA's] requirements are that an emission limitation in a SIP must be an 'emission limitation' as defined in section 302(k).").

Even if EPA never wholeheartedly embraces that sort of argument, our dissenting colleague subscribes to it. She stresses that "the states have repeatedly told us that their SIPs do contain emission limitations as contemplated by the Clean Air Act." Dissenting Op. 20. The apparent upshot of that view is that, whenever a state calls an emission restriction in its SIP an "emission limitation," it necessarily buys into the notion that the restriction must satisfy the statutory definition of that term. That rationale, in other words, essentially tells the states: "You at times have referred to the emission restrictions in your SIPs as 'emission limitations.' Because you did so, you are now stuck with those restrictions' having to meet the statutory

definition of that term, regardless of whether meeting the definition is in fact necessary or appropriate for you to comply with the CAA's requirements."

EPA never adopts that kind of argument. The agency understandably may not wish to treat the statute as creating what amounts to a semantic "gotcha" game. When a state develops and submits a SIP for approval, the SIP includes a suite of substantive restrictions that the state—per section 7410(a)(2)(A)—considers "necessary or appropriate" to comply with the CAA. Even if a state uses the words "emission limitation" to describe a given emission restriction in its SIP, there is no indication that the state thereby means it wants, above all else, for the restriction to qualify as an "emission limitation" as defined by the CAA, *however that term may be construed by a court*—let alone that the state wants the restriction to be an "emission limitation" *that operates during SSM periods*. To the contrary, when the state includes an automatic exemption for SSM periods in a measure it might describe as an "emission limitation," that necessarily negates any notion that, by using the label "emission limitation," the state somehow accepts that its so-called "emission limitation" would have to apply during SSM periods if a court were ultimately to decide that the "limitation" would otherwise fail to meet the statutory definition.

A state, in other words, presumably wants the *substance* of the emission restriction it puts in a SIP, including any exemption for SSM periods. The state does not simply want to satisfy the statutory *label* "emission limitation," even if that means letting go of the SSM exemption it adopted. Why should any state be understood to prize the label over the substance—such that the state is somehow deemed to have accepted that, even though it made the considered decision to adopt an SSM exemption, it would cast aside the exemption

just to enable the associated emission restriction to be accurately called an "emission limitation" per the statutory definition? Why should any state be thought to have accepted (let alone desired) that label-over-substance outcome?

Imagine, for example, a hypothetical state whose emission levels comply with the NAAQS and all other applicable CAA requirements, but whose emission restrictions are subject to automatic exemptions. Why would such a state care (at least for purposes of the issue in this case) if its emission restrictions amount to "emission limitations" per the statutory definition? The state is already complying with the CAA regardless of the answer to that question. Our dissenting colleague believes that EPA nonetheless could call such a state's SIP solely on the ground that its emission restrictions fail to satisfy the definition of an "emission limitation"—apparently because the state at one point might have described its restrictions as "emission limitations." Calling a SIP in that situation would serve no purpose other than a semantic one: advising the state that it cannot accurately refer to its emission restrictions by using the statutory term of art "emission limitations." Nothing in the statute supports EPA's authority to call a state's SIP for that sort of language-policing reason.

It is irrelevant for these purposes that states first developed their SIPs under an older version of section 7410(a)(2)(A) that may have required SIPs to contain emission limitations. *See* Dissenting Op. 23. The statute's text has changed, as explained, and EPA must justify its actions under the revised version of the statute in effect when it called the SIPs. EPA does not suggest otherwise—and in fact, EPA in its briefing in our court never once mentions the previous statutory language or that the language has changed.

Nor does it matter that Petitioners may believe "the SIPs at issue here do include emission limitations." *Id.* at 10-11. True, Petitioners argue that the emission restrictions in the SIPs at issue meet the definition of "emission limitations" even though they are subject to automatic exemptions. *See* Ind. Pet. Br. 40-51; State Pet. Br. 24-28. But by making that argument, Petitioners in no way abandon their position that those restrictions need not qualify as "emission limitations" in the first place unless their doing so is "necessary or appropriate" to enable a state's compliance with the CAA's requirements. That compliance is ultimately what matters to a state, not whether its emission restrictions happen to meet the statutory definition of an "emission limitation." Again, why would a state prioritize a restriction's fitting within the statutory label "emission limitation" over retaining the substance of the restrictions it adopted (including any SSM exemption)? It would not.

\*     \*     \*

Although we set aside EPA's call of automatic exemptions, our decision is necessarily confined to the particular "grounds on which the agency acted." *Michigan*, 576 U.S. at 760. The central deficiency in EPA's rationale is that, in relying chiefly on section 7410(a)(2)(A) to support its action, the agency did not make the kind of predicate "necessary or appropriate" determination required by the straightforward language of that provision. We thus do not reach the question whether the called SIPs' relevant emission restrictions in fact amount to (or must amount to) "emission limitations" per the statutory definition.

If EPA in the future were to determine that, for states to meet the CAA's applicable requirements, it is "necessary or appropriate" for their emission reduction measures to meet the

statutory definition of "emission limitations" and operate during SSM periods, the agency could explain and implement that rationale and its action would be subject to judicial review. Here, however, the agency merely reasoned that every emission restriction in a SIP needs to be continuous to qualify as an "emission limitation" per the statutory definition, without explaining why that continuity is "necessary or appropriate" to meet any of the CAA's requirements (beyond the definition itself). That rationale cannot be sustained.

B.

We next consider EPA's call of SIPs containing director's discretion provisions. For largely the same reasons that we set aside EPA's call of automatic exemptions, we also set aside EPA's call of director's discretion provisions.

Director's discretion provisions are essentially exemptions but with an added step. *See* State Implementation Plans, 80 Fed. Reg. at 33,927/3. Whereas automatic exemptions go into effect automatically whenever there is an SSM event, director's discretion provisions give state officials discretion to grant SSM-related exemptions from otherwise applicable emission limitations. According to EPA, the "director's discretion SIP provisions at issue present the same problems and inconsistencies with CAA requirements as those that create automatic exemptions." EPA Br. 51. Specifically, director's discretion provisions render "emission limitations less-than-continuous and preclud[e] enforcement for what would be violations absent the discretionary exemptions." *Id.* at 68.

That continuity-based rationale fails as to director's discretion provisions for the same reasons it fails as to automatic exemptions: Before concluding that emission restrictions in a SIP must apply continuously (including during SSM periods), EPA needed to determine that it is "necessary

or appropriate" that the restrictions be continuous to enable the state to "meet the [CAA's] applicable requirements." 42 U.S.C. § 7410(a)(2)(A). But EPA did not make the requisite "necessary or appropriate" finding. And insofar as EPA relatedly believes that director's discretion provisions unduly impede enforcement of the CAA, that rationale falls short for the same reasons as with automatic exemptions: While SIPs must provide for enforcement of their measures, *see id.* § 7410(a)(2)(C), that requirement does not speak to the content of the measures to begin with, including whether they must operate continuously. *See* p. 43, *supra*.

EPA also offers one additional rationale in support of its call of director's discretion provisions, this time one that does not apply to automatic exemptions. In the agency's view, a director's discretion provision, by enabling a state official to exempt an otherwise applicable emission restriction from SSM periods, impermissibly allows the official to modify a SIP unilaterally, without going through the CAA's prescribed procedures for revising a SIP. *See* 42 U.S.C. § 7410(*l*). We find that rationale no more persuasive than the others.

A SIP with a director's discretion provision has built within it the possibility that a state official will grant an exemption from an otherwise applicable emission restriction. And EPA itself, when it initially approved the SIP, authorized inclusion of that provision in the SIP. 42 U.S.C. § 7410(k)(3). So when a state official exercises the discretion conferred by such a provision, that is merely an *application* of the EPA-approved SIP to a particular situation, not a revision of the SIP. To be sure, in granting an exemption, the official alters the applicability of an emission restriction. But the official does not alter the underlying *SIP*. Rather, the SIP is what conferred the power to grant the exemption in the first place.

For those reasons, we conclude that EPA arbitrarily acted in excess of its authority in calling director's discretion provisions. In reaching that conclusion, we do not foreclose the possibility that EPA in the SIP Calls touched on reasons that specific director's discretion provisions, depending on their particulars, might interfere with the CAA. For instance, EPA broached whether a provision might be so unbounded as to interfere with the agency's ability to predict the impact on compliance with the CAA's requirements. *See* State Implementation Plans, 80 Fed. Reg. 33,927/3-33,928/1. But EPA seeks to sustain its call of director's discretion provisions as a group based either on the same continuity-based rationale it offered for calling automatic exemptions or on its distinct rationale about SIP revisions. The agency does not argue that its call of specific director's discretion provisions can be sustained absent either of those rationales that apply to the full group of called provisions. We thus have no occasion to address any other reasons that could be offered in support of calling specific director's discretion provisions.

C.

As to both automatic exemptions and director's discretion provisions, in short, EPA called the SIPs at issue without making the "necessary or appropriate" determination called for by the terms of section 7410(a)(2)(A). To the extent our dissenting colleague doubts the substantive merits of that conclusion, we have explained why we believe any such view is groundless. We now address an equally misconceived procedural objection she repeatedly presses.

Our colleague claims that we set aside EPA's call of automatic exemptions and director's discretion provisions based on an argument Petitioners nowhere make. She says that "Petitioners did not argue" that "emission limitations are

required only as 'necessary or appropriate.'" Dissenting Op. 17-18. Or, equivalently: It is a "new reading" of the statute, nowhere urged by Petitioners, "that a SIP must include 'emission limitations' only to the extent 'necessary or appropriate to meet the applicable requirements' of the Clean Air Act." *Id.* at 18 (quoting 42 U.S.C. § 7410(a)(2)(A)).

*That* is a proposition "Petitioners did not argue"? *Id.* at 17. Hardly so. Here is what Petitioners contend in their brief, in their own words: "[R]egardless of what 'emission limitation' means, Congress explicitly provided states discretion to impose them *only as 'necessary or appropriate'* to meet some other applicable requirement of the CAA." Ind. Pet. Br. 49 (emphasis added) (quoting 42 U.S.C. § 7410(a)(2)(A)). That is *exactly* the proposition our colleague insists Petitioners never argued. There is no daylight between arguing "that a SIP must include 'emission limitations' only to the extent 'necessary or appropriate to meet the applicable requirements' of the Clean Air Act," Dissenting Op. at 19 (quoting 42 U.S.C. § 7410(a)(2)(A)), and arguing that Congress gave "discretion to impose them [*i.e.*, emission limitations] only as 'necessary or appropriate' to meet some other applicable requirement of the CAA," Ind. Pet. Br. 49 (quoting 42 U.S.C. § 7410(a)(2)(A)). Those contentions are self-evidently one and the same.

Our dissenting colleague asserts that Petitioners, in arguing that a SIP needs to include emission limitations "only as 'necessary or appropriate' to meet some other applicable requirements of the CAA," *id.*, assumed the need to satisfy the definition of "emission limitations" and disputed only whether the definition's "continuity requirement" is met. Dissenting Op. 18. That is incorrect. Far from assuming the definition's applicability, Petitioners argued that, *regardless* of the definition, a SIP must include emission limitations only if

necessary or appropriate: *"[R]egardless of what 'emission limitation' means*, Congress explicitly provided states discretion to impose them only as 'necessary or appropriate' to meet some other applicable requirement of the CAA." Ind. Pet. Br. 49 (emphasis added) (quoting 42 U.S.C. § 7410(a)(2)(A)).

What is more, after so setting out exactly the interpretation of section 7410(a)(2)(A) on which our rejection of the SIP Calls rests, Petitioners go on to make several integrally associated, follow-on points that we have also found persuasive. Petitioners explain that, while "EPA attempts to dismiss the 'necessary or appropriate' language by interpreting the subsequent phrase 'requirement of this chapter' to include the definition of 'emission limitation,'" that definition, "[w]hatever [it] means," is "not a standalone 'requirement' of the Act." *Id.* at 50. Precisely so. *See* pp. 34-38, 40-41, *supra*. That definition, Petitioners elaborate, "says nothing about the applicability of emission limitations." Ind. Pet. Br. 42. True. *See* pp. 40-41, *supra*. Those points solely make sense in the context of Petitioners' argument that a SIP needs to contain "emission limitations" only as necessary or appropriate. Petitioners add that "EPA's interpretation" of section 7410(a)(2)(A) would "depriv[e] states[] the choice of not applying emission limitations to some or all sources during SSM (or other) periods." Ind. Pet. Br. 51. Yes again. *See* pp. 52-55, *supra*. And "[i]f Congress did not want states to have discretion to determine how 'emission limitations' were applied in SIPs, it could have adopted more prescriptive measures," as "it did in CAA § 112," Ind. Pet. Br. 51, the materially different provision we considered in *Sierra Club*. Right once more. *See* pp. 41-42, *supra*.

Tellingly, moreover, EPA fully understands the argument that Petitioners are making (and that our colleague nonetheless asserts Petitioners have not made). In describing "Petitioners'

arguments" against it, EPA includes the following as a "key point" pressed by Petitioners: "EPA misinterprets section 7410(a)(2)(A)." EPA Br. 43. In particular, EPA explains, "Petitioners contend that EPA is trampling the States' discretion under section 7410(a)(2)(A) to determine what 'enforceable emission limitations and other control measures . . . [are] necessary or appropriate' to meet CAA requirements." *Id.* at 48 (alterations in original) (quoting Ind. Pet. Br. 50-52; and 42 U.S.C. § 7410(a)(2)(A)). That is indeed what Petitioners argue is the upshot of EPA's mistaken (in Petitioners' view) understanding of the terms of section 7410(a)(2)(A), particularly the provision's "necessary or appropriate" clause. And as we have explained, we find Petitioners' argument on that score to be persuasive.

EPA, in attempting to respond to Petitioners' argument in that regard, further confirms that it understands Petitioners to be making the argument our colleague professes Petitioners do not advance. EPA states: "States *do* have the discretion *not* to regulate a source or source category entirely if doing so is not necessary or appropriate to meet CAA requirements." *Id.* at 50. Why would EPA make it a point to concede that there *is* some discretion to refrain from applying an emission limitation when it is not "necessary or appropriate" to meet the CAA's requirements, unless EPA understands Petitioners to be arguing that emission limitations need only be included in a SIP if they are "necessary or appropriate" to meet the CAA's requirements? To be sure, EPA ultimately has no persuasive response to Petitioners' argument on that score; but as to whether Petitioners in fact make the argument, EPA plainly believes they do. Indeed, EPA, in attempting to respond to Petitioners' argument, cites the exact four pages of the 146-page Final Action containing the agency's response to the argument that the Action mistakenly overlooks the significance of section 7410(a)(2)(A)'s "necessary or appropriate"

language—the argument our colleague believes Petitioners do not make. *See id.* at 50 (citing 80 Fed. Reg. at 33,902-03); *id.* at 51 (citing 80 Fed. Reg. at 33,896-97).

All of which is to say: Petitioners absolutely *do* argue that a SIP needs to "include 'emission limitations' only to the extent 'necessary or appropriate to meet the applicable requirements' of the Clean Air Act." Dissenting Op. 19 (quoting 42 U.S.C. § 7410(a)(2)(A)). And EPA understands Petitioners to so contend. Our colleague might wish that EPA responded more fulsomely or in a different way to that argument. EPA, for instance, does not rely in its brief on our colleague's notion that the SIPs must contain "emission limitations" as defined by the CAA because the states sometimes used those words when referring to the emission restrictions in the challenged SIPs. Perhaps EPA opted against relying on that notion upon recognizing its shortcomings. *See* pp. 52-55, *supra*.

We note, lastly, that even if Petitioners had not made the "necessary or appropriate" argument that we ultimately find persuasive, we are "not limited to the particular legal theories advanced by the parties, but rather retain[] the independent power to identify and apply the proper construction of governing law." *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991). After all, because "[o]ur task is to construe what Congress has enacted," we need not "accept an interpretation of a statute simply because it is agreed to by the parties." *Rumsfeld v. F. for Acad. & Inst. Rts.*, 547 U.S. 47, 56 (2006) (quoting *Duncan v. Walker*, 533 U.S. 167, 172 (2001)). Petitioners of course pointed us to the relevant "governing law," *Kamen*, 500 U.S. at 99—*i.e.*, the terms of 42 U.S.C. § 7410(a)(2)(A). *See* EPA Br. 43 (understanding Petitioners to argue that "EPA misinterprets section 7410(a)(2)(A)"). And once we look at that provision, the significance of its "necessary or appropriate" clause to the validity of EPA's SIP

Calls is hardly hidden beneath the surface: It essentially jumps off the page upon a scan of the provision's terms.

Here, in any event, Petitioners not only directed us to section 7410(a)(2)(A), but they also explained precisely how the provision's language undermines EPA's basic rationale for calling the automatic exemption and director's discretion provisions: "[R]egardless of what 'emission limitation' means, Congress explicitly provided states discretion to impose them only as 'necessary or appropriate' to meet some other applicable requirement of the CAA." Ind. Pet. Br. 49 (quoting 42 U.S.C. § 7410(a)(2)(A)). EPA has no persuasive answer to that contention. Nor, in our respectful view, does our dissenting colleague.

## D.

EPA (by its own account) called only one SIP, Tennessee's, for containing overbroad enforcement discretion provisions. *See* TENN. COMP. R. & REGS. 1200-3-20-.07-(1), .07(3). It found those provisions ambiguous: The provisions could be read to limit only Tennessee's enforcement discretion, but EPA thought that they could also be read to allow Tennessee officials to foreclose EPA enforcement actions and citizen suits.

The Petitioners do not question that the provision would be unlawful if the second reading is correct. Instead, they say that EPA cannot call a SIP for being ambiguous, and that EPA should have deferred to Tennessee's construction of any potentially ambiguous terms.

We have already rejected those arguments. We therefore deny the petitions for review as to Tennessee's overbroad enforcement discretion provisions.

64

E.

We finally turn to EPA's calls based on affirmative defense provisions.

States have included two kinds of affirmative defenses in their SIPs, and each requires a different analysis.

One kind provides "a complete affirmative defense to an action brought for non-compliance" with an emission rule, provided the source complies with certain conditions. 118-01-19 ARK. CODE R. § 602. Those affirmative defenses create an exemption from the normal emission rule. So our automatic-exemption analysis applies equally to them.

The other kind precludes certain remedies after a source has violated an emission rule. In Arizona, for example, a source generally has an affirmative defense for excess emissions during SSM period, except in a "judicial action seeking injunctive relief." ARIZ. ADMIN. CODE § 18-2-310(B)-(C). Those raise a different legal question: whether states can limit the relief that Congress empowered federal courts to grant for violations of emission rules. We hold that they cannot.

As part of its enforcement regime, the Clean Air Act authorizes citizens and EPA to seek injunctive relief and monetary penalties against sources that violate SIPs' emission rules. 42 U.S.C. §§ 7604(a), 7413(b). Affirmative defenses against certain remedies block that aspect of the Act's enforcement regime.

That is why, in *NRDC v. EPA*, we determined that EPA could not provide an affirmative defense against monetary damages as part of a federal emission rule. 749 F.3d at 1063-

64. We explained that the Act's citizen-suit provision "clearly vests authority over private suits in the *courts*, not EPA." *Id.* at 1063. Thus, "the Judiciary, not any executive agency, determines the scope—*including the available remedies*—of judicial power vested by statutes establishing private rights of action." *Id.* (internal quotation marks omitted) (quoting *City of Arlington v. FCC*, 569 U.S. 290, 302 n.3 (2013)). We therefore held that once a court finds a violation in a private suit, it is for the court alone to determine the appropriate civil penalties. *Id.*

Of course, *NRDC* did not address SIPs. 749 F.3d at 1064 n.2. But "statutes are not chameleons, acquiring different meanings when presented in different contexts." *Maryland*, 958 F.3d at 1202. The enforcement provisions that we analyzed in *NRDC*—sections 113 and 304 of the Act—apply to state-created emission rules just as they do to EPA-created rules. *See* 749 F.3d 1055.

The Petitioners offer three reasons that they believe the SIP context is different. Each is unpersuasive.

First, the Petitioners argue the Act grants states the power to alter its enforcement regime through the Act's requirement that SIPs "include a program to provide for the enforcement of the" SIPs' substantive rules. 42 U.S.C. § 7410(a)(2)(C).

They are incorrect. That provision, § 110(a)(2)(C) of the Act, instructs states to "provide for the enforcement" of substantive emission rules. To provide is to "furnish" or "supply" something—here, enforcement. *Provide*, THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH

LANGUAGE (1976).[1] A duty to supply enforcement does not carry with it the power to limit other enforcement efforts that the Clean Air Act authorizes.

That understanding is confirmed when the words in section 7410(a)(2)(C) are read "in their context and with a view to their place in the overall statutory scheme." *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 101 (2012) (quoting *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989)). That section is part of a long list of *duties* that Congress imposed on states. *E.g.*, 42 U.S.C. § 7410(a)(2)(B) ("provide for establishment and operation of appropriate devices, methods, systems, and procedures necessary to monitor, compile, and analyze data on ambient air quality"). None of those other duties empowers states to alter other aspects of Congress's scheme. And neither does section 7410(a)(2)(C).

Second, the Petitioners observe that Congress left it to the states "to determine which sources would be burdened by regulation and to what extent." *Union Elec. Co.*, 427 U.S. at 269. From that premise, they conclude that states' general discretion to determine what types of emission rules are "necessary or appropriate" to meet the Act's requirements allows them to decide how those rules should be enforced. 42 U.S.C. § 7410(a)(2)(A).

But states' power to decide whom and how to regulate does not carry with it the power to alter the consequences Congress chose for violating those regulations. Rather, Congress specifically determined how EPA and citizens could

---

[1] *See also Provide*, WEBSTER'S NEW WORLD DICTIONARY OF THE AMERICAN LANGUAGE (2d ed. 1972) (same); Clean Air Act Amendments of 1977, Pub. L. No. 95-95, § 108, 91 Stat. 685, 693 (adding the provision that is now section 110(a)(2)(C)).

enforce the regulations that the states choose to impose. And it left it to the courts to determine the appropriate penalties for violations. *See* 42 U.S.C. §§ 7413, 7604(a); *NRDC v. EPA*, 749 F.3d at 1063.

Third, the Petitioners say that if we agree with EPA, we will create a split with the Fifth Circuit's decision in *Luminant Generation Co. v. EPA*, 714 F.3d 841 (5th Cir. 2013). There, the Fifth Circuit's textual analysis consisted of the following sentence: "[S]ection 7413 does not discuss whether a state may include in its SIP the availability of an affirmative defense against civil penalties for unplanned SSM activity." *Id.* at 852. It then deferred to EPA's pre-*NRDC* view that affirmative defenses against monetary damages for unavoidable excess emissions were lawful. *Id.* at 853.

We "avoid creating circuit splits when possible." *United States v. Philip Morris, USA, Inc.*, 396 F.3d 1190, 1201 (D.C. Cir. 2005). But *NRDC* already rejected the Fifth Circuit's silence-as-delegation logic, and we must follow *NRDC*. 749 F.3d at 1064; *Ali v. Rumsfeld*, 649 F.3d 762, 775 n.20 (D.C. Cir. 2011) ("We are of course bound by circuit precedent."). So any disagreement with the Fifth Circuit about the Act's meaning has existed since 2014; we are just applying it now in the same context that the Fifth Circuit did. Just as *NRDC*'s rule foreclosed EPA's affirmative defense, it likewise forecloses affirmative defenses in SIPs. *NRDC v. EPA*, 749 F.3d at 1064.

In short, states cannot limit courts' discretion to determine and apply appropriate civil penalties for violations of SIPs. We therefore deny the petitions for review as to affirmative defenses against monetary damages.

\* \* \*

As to the calls based on automatic exemptions, director's discretion provisions, and affirmative defenses that are functionally exemptions, we grant the petitions and vacate the SIP-call order. We deny the petitions as to the calls based on the enforcement-discretion provision and affirmative defenses against specific relief.

*So ordered.*

PILLARD, *Circuit Judge*, concurring in part and dissenting in part:

The majority and I agree on quite a bit. We agree that EPA correctly interpreted its SIP-call authority under the Clean Air Act and that Petitioners' crosscutting challenges to that authority fail. I also join the majority in denying the petitions for review with respect to Tennessee's overbroad enforcement-discretion provisions and those affirmative defenses that operate to preclude certain remedies after a source has violated an emission rule. I thus join Analysis Sections I and II.C in full and Section II.D in part.

But the majority missteps in vacating EPA's decision to call state implementation plans that are substantially inadequate under the Clean Air Act because they include automatic exemptions, director's discretion provisions, or affirmative defenses that operate as wholesale exemptions for SSM events. As for those provisions, EPA got it right: The Clean Air Act requires "emission limitations" (also referred to as "emission standards") to apply continuously, and the emission limitations in the SIPs subject to this call violate that requirement.

Reading the majority, one might think this case is about *whether* the SIP provisions challenged as discontinuous are emission limitations at all. But make no mistake: No challenger pressed before this court that the SIPs at issue did not contain emission limitations. No challenger defended on the ground that pollution-restricting measures that limit the quantity, rate, or concentration of air pollutants were not "emission limitations," or that EPA fell short of establishing before issuing its SIP Calls that the measures the states included as "emissions limitations" were "necessary or appropriate" to their SIPs. Quite the opposite. The states have long and repeatedly used the statutorily defined term "emission limitations" to refer to their disputed pollution

restrictions. And they have defended them as "emissions limitations" that they view as appropriate to meet their Clean Air Act obligations. The Petitioners' briefs object only that EPA misunderstood what it means for an emission limitation to be "continuous" and that, even under EPA's reading of the continuity requirement, the SIPs contain continuous emission limitations. *See* States Br. 7, 22-34; States Reply Br. 1, 8, 11-12; Indus. Br. 36-52.

My colleagues nevertheless reject EPA's SIP Call by hypothesizing that the plans at issue may be entirely devoid of "emission limitations" as the Act defines them. Positing that a discontinuous emission limitation is no emission limitation at all, they say that the challenged SIPs cannot be substantially legally deficient for failing to meet the requirement that "emission limitations" apply on a continuous basis. *See* 42 U.S.C. § 7602(k); Maj. Op. 37. The majority also sees the states' submission and EPA's approval of these SIPs as reason to treat the emission limitations in the SIPs as *not* "enforceable emission limitations" under the Act: Given the statutory definition of "emission limitations" as continuous, say my colleagues, the states cannot have proffered, nor EPA approved, those overtly discontinuous measures as "enforceable emission limitations." 42 U.S.C. § 7410(a)(2)(A); Maj. Op. 50-52.

But that is wrong for at least three reasons.

First, EPA has been candid that its initial approval was in error to the extent it overlooked the discontinuity of the emission limitations when it initially approved them. And Petitioners do not argue that EPA's initial approval of their SIPs estops the agency from calling the SIPs to fix its errors.

Second, Petitioners themselves refer to the disputed measures as emission limitations. In legally consequential

filings—including their briefs in this very case, comments to EPA, and the SIPS themselves—the petitioning states have repeatedly referred to their chosen control measures as containing "emission limitations." The majority brushes those statements aside as semantic missteps: Because it was against the petitioning states' interests to do so, they must not have meant to acknowledge that their discontinuous rules are "emission limitations" when, on the majority's logic, they could have avoided the Act's continuous-applicability requirement simply by calling them something else. But that cuts the other way. In both law and common sense, statements made against a speaker's own interest are taken as more likely to be accurate, not less.

Third, the statute appears to treat "emission limitations" and "other control measures" as distinct categories of restrictions. Without briefing on the issue, I would hesitate to reduce that distinction to whether a restriction is continuous. The crux of my colleagues' approach is that the discontinuity of an emission limitation just redefines it as an "other control measure." In the face of textual and structural reasons to doubt Congress intended that workaround, we should not rely on it here to excuse the deficiencies EPA identifies.

I would have answered the questions presented to us— namely, how to interpret Congress's direction that emission limitations operate on a continuous basis, and whether the emission limitations in the SIPs at issue violate that continuity requirement. On the issues as to which today's decision both departs from the briefing before us and arrives at a novel interpretation of the strictures of the Clean Air Act, I respectfully dissent.

4

**I.**

This case concerns the difficult task of curbing harmful air pollution released by industrial facilities during their startup, shutdown, or malfunction. Those so-called SSM events may involve, for example, leaks, flares, and even explosions. Releases during SSM events often far exceed emissions from normal operations because facilities may operate less efficiently than during steady-state operation and because facilities often bypass controls when they are starting up, shutting down, or malfunctioning. *See* Intervenors' Br. 1; Indus. Br. 7 n.4. Excess emissions from SSM events can be regular occurrences: One Georgia facility, for example, exceeded applicable emission limits on "thousands of occasions" over a four-year period. *Sierra Club v. Ga. Power Co.*, 443 F.3d 1346, 1347 (11th Cir. 2006); *see id.* at 1350. The exceedances can be dramatic: Another plant released "three times its daily limit" of a pollutant "over a nine-hour period." *US Magnesium, LLC v. EPA*, 690 F.3d 1157, 1163 (10th Cir. 2012).

The pollutants that SIPs must control include particulate matter, sulfur dioxide, lead, and others that damage human respiratory, cardiac, and neurological health. *See* 40 C.F.R. pt. 50. SSM events can involve bursts of such pollutants in high concentrations. Mounting scientific evidence links concentrated bursts of pollutants to severe harm to public health and welfare. Those harms fall disproportionately on industrial facilities' neighboring communities, many of which are socially and economically disadvantaged. For those communities, frequent industrial flaring events, for example, cause myriad health and welfare problems—from burning sensations in the nose and throat to respiratory illness to cancer. *See generally* Intervenors' Br. 2-3, 7-13.

The harms caused by SSM emissions are often avoidable. Industrial sources are technologically capable of minimizing emissions during startup and shutdown and reducing the frequency of, and damage caused by, malfunctions. *Id.* at 16; *see also* SIP Calls, 80 Fed. Reg. 33,840, 33,874/3 (June 12, 2015). But they may lack the incentive to do so. After all, many state implementation plans simply exempt excess emissions during SSM events from the otherwise-applicable emission limitations that are designed to curb air pollution. As a result, emissions during SSM events that exceed otherwise-applicable emission limitations are not treated as enforcement risks that should drive compliance. EPA Br. 17-19. No wonder that many industrial sources have not made the investments necessary to protect our air from the harmful emissions released during startup, shutdown, and malfunction.

SSM exemptions are regulatory loopholes. In the years since EPA initially approved such exemptions, the agency has come to recognize that they conflict with the Clean Air Act's requirement that emission restrictions apply continuously. SSM exemptions allow sources to emit pollutants causing "unacceptable air pollution in nearby communities," without any legal mechanism for state air agencies, EPA, the public, or courts to require greater efforts to reduce emissions. 80 Fed. Reg. at 33,843/3. The exemptions also undercut states' ability to meet Clean Air Act requirements, such as attaining and maintaining the NAAQS, preventing significant deterioration of air quality in attainment areas, and protecting visibility. EPA Br. 18; Memorandum to Docket for Rulemaking: Statutory, Regulatory, and Policy Context for this Rulemaking, Docket No. EPA-HQ-OAR-2012-0322-0029, at 23 (Feb. 4, 2013) (J.A. 430).

EPA has identified these substantial regulatory loopholes, but it remains difficult to measure just how damaging

uncontrolled SSM emissions are. Because emissions during SSM events are exempt from emission limitations, they are often not tracked with any precision or regularity. Indeed, emission inventories typically "presume compliance by sources at all times throughout the year" and are "not adjusted to include excess emissions that occur as a result [of] SSM events." Memorandum to Docket for Rulemaking at 23 (J.A. 430). Those inaccuracies in emission inventories ripple throughout the SIP planning process, distorting strategies for attaining the NAAQS and downstream modeling of NAAQS attainment. *See id.* at 23-24 (J.A. 430-31). EPA did not "rest the SIP Call" on these distortions, Maj. Op. 39, but it did not dismiss them either, *cf. id.* According to EPA, discontinuous source compliance with emission limitations has a "negative impact" on the accuracy of emissions inventories and SIP planning and could "have a larger negative effect" if not disallowed. 80 Fed. Reg. at 33,950/1-51/1.

Most of the SSM exemptions are, as EPA put it, "artifacts of the early phases of the SIP program, approved before state and EPA regulators recognized the implications of such exemptions." 80 Fed. Reg. at 33,957/3. After hurriedly approving such SSM exemptions in the wake of the 1970 Amendments to the Clean Air Act, EPA soon realized that they were "not consistent" with the Act. *Id.* In a series of guidance documents dating back to 1982, EPA communicated to states that the Clean Air Act bars exemptions from emission limitations for SSM events. *Id.*; *see* Memorandum to Docket for Rulemaking at 8-16 (J.A. 415-23) (describing EPA's longstanding SSM policy). But, while EPA has long interpreted the Act to prohibit SSM exemptions, many states did not update their SIPs to remove those loopholes.

Recall that the Clean Air Act sets out requirements for SIPs, including that:

Each SIP shall—

(A) include enforceable emission limitations and other control measures, means, or techniques (including economic incentives such as fees, marketable permits, and auction of emissions right), as well as schedules and timetables for compliance, as may be necessary or appropriate to meet the applicable requirements of this chapter."

42 U.S.C. § 7410(a)(2)(A). Congress defined an "emission limitation" and "emission standard" as:

a requirement established by the State or the Administrator which limits the quantity, rate, or concentration of emissions of air pollutants on a *continuous* basis, including any requirement relating to the operation or maintenance of a source to assure *continuous* emission reduction, and any design, equipment, work practice or operational standard promulgated under [the Clean Air Act].

42 U.S.C. § 7602(k) (emphasis added).

That brings us to the SIP Calls at issue here. After decades of inaction to correct those deficient SIPs, EPA in 2015 called SIPs from 35 states and the District of Columbia as substantially inadequate to the extent they exempted SSM events from emission limitations. EPA explained that, by carving out SSM events from otherwise-applicable emission limitations, those SIPs violated the Clean Air Act's requirement that emission limitations operate "on a continuous basis," 42 U.S.C. § 7602(k). *See, e.g.*, 80 Fed. Reg. at 33,852/1-2, 33,927/1-3, 33,928/3. A subset of the states—roughly half of those originally subject to the SIP

Calls—and certain industry groups and companies seek review in this court.

## II.

Petitioners' challenges to EPA's SIP Calls present two questions of relevance here: (1) whether emission limitations in SIPs must apply at all times to satisfy the Clean Air Act's requirement that emission limitations operate "on a continuous basis," 42 U.S.C. § 7602(k), and (2) whether the state plans subject to this SIP Call violated that requirement when they exempted SSM emissions from otherwise-applicable emission limitations. The answer to both questions is yes. The Clean Air Act requires that emission limitations apply continuously. The called SIPs violated that requirement when they included automatic exemptions, director's discretion provisions, and certain affirmative defenses that exempt emissions during SSM events from the SIPs' otherwise-applicable emission limitations.

Perplexingly, the majority answers neither question. Rather, my colleagues devote their attention to what they say is an "essential premise" of EPA's SIP Calls—namely, that the Clean Air Act invariably requires all SIPs to contain emission limitations as the Act defines them. Maj. Op. 34. The majority then questions the legitimacy of that premise by deciding that the Act does not require every SIP to include such a limitation. But that so-called premise is not before us. Petitioners do not controvert it, nor does EPA see the need to defend it in this case. The position adopted by the majority is nowhere to be found in the briefing. That is because the straw "premise" it targets is not at all "essential" to the SIP Call before us. Even if the majority is correct that the Act does not invariably require every SIP to include emission limitations, it is enough that as a practical matter the called SIPs in this case

all purport to include them. Indeed, States submitted and EPA approved them under an earlier version of the Act, when "a SIP always needed to include 'emission limitations.'" Maj. Op. 47. Accordingly, the parties all understood the SIPs at issue to contain "emission limitations" to which the challenged SSM carveouts apply. *See infra* 20-21. That is reason enough not to go down the path taken by the majority.

## A.

Start with the arguments the parties did bring before this court. The Petitioners claim that exemptions for SSM events do not violate the Clean Air Act's requirement that emission limitations be continuous. The thrust of their argument proceeds in two steps. First, Petitioners argue that an emission limitation meets the Act's continuity requirement so long as it is "'continuous' over some period of time or condition," even if "not necessarily *all* periods of time." Indus Br. 42. *See* Indus. Br. 40-47, 50-52. Under that reading, the Act's continuity requirement merely prohibits the use of intermittent emission control technologies, which "vary their level of emission control based on air quality." Indus. Br. 46 (emphasis omitted); *see also* States Br. 25. Second, Petitioners claim in the alternative that, even if emission limitations must apply at all times, the SIPs comply because they "include 'general duty' requirements" that obligate sources "to minimize emissions either at all times, or as a prerequisite to an exception to application of a numeric 'emission limitation.'" Indus. Br. 38; *see id*. at 38-40; States Br. 10, 22-28. Neither of those arguments treats the called SIPs as devoid of "emission limitations" within the meaning of the Act. Rather, they defend as "continuous" the emission limitations the states chose to include. Because the emission limitations in the called SIPs are not continuous, Petitioners' challenges fail.

Start with the text. In the Clean Air Act, Congress specified what constitutes an emission limitation. An emission limitation is "a requirement" that "limits the quantity, rate, or concentration of emissions of air pollutants on a continuous basis." 42 U.S.C. § 7602(k). Recognizing the myriad methods by which a state might limit emissions—from numerical caps to work practice standards to technological controls—Congress defined "emission limitations" expansively. The statutory definition "includ[es] any requirement relating to the operation or maintenance of a source" as well as "any design, equipment, work practice or operational standard…." *Id.*

Importantly for our purposes, the Clean Air Act demands that, whatever of those various forms it takes, a limitation on "the quantity, rate, or concentration of emissions of air pollutants" *must* operate "on a continuous basis," *id.*; that is, an emission limitation must apply at all times. As EPA explained, "the word 'continuous' is not separately defined in the Act," but "its plain and unambiguous meaning is 'uninterrupted.'" 80 Fed. Reg. at 33,901/1; WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 493-94 (Phillip Babcock ed. 1976) ("operated without interruption"). An emission limitation is not continuous if it "provides for any period of time when a source is *not* subject to any requirement that limits emissions." 80 Fed. Reg. at 33,901/1-2. That continuity requirement helps protect our nation's air quality. As Congress emphasized when amending the Clean Air Act, "[w]ithout an enforceable emission limitation which will be *complied with at all times*, there can be no assurance that ambient standards will be attained and maintained." H.R. REP. NO. 95-294, at 92 (1977) (emphasis added).

Against that backdrop, we have interpreted the Clean Air Act's requirement of "continuous" emission limitations to

mean that some emission limitation or standard must apply at all times. In *Sierra Club v. EPA*, 551 F.3d 1019 (D.C. Cir. 2008), we considered a decision by EPA to exempt SSM events from compliance with hazardous air pollutant standards under section 112 of the Clean Air Act. *Id.* at 1026. We there read section 112, requiring EPA to establish emission standards for hazardous air pollutants, alongside section 302(k), requiring emission limitations and standards to apply "on a continuous basis," 42 U.S.C. § 7602(k). *Sierra Club*, 551 F.3d at 1027. Interpreting those provisions together, we concluded that "Congress has required that there must be continuous section 112-compliant standards" and that "the SSM exemption violate[d]" that requirement. *Id.* at 1027-28.

*Sierra Club*'s logic applies with equal force here. In the Clean Air Act, Congress required that emission limitations included in SIPs be continuous. SSM exemptions violate that requirement. The majority attempts to distinguish *Sierra Club*, claiming it does not answer the question the majority injects into this case: that is, whether the Clean Air Act requires any emission limitations whatsoever in SIPs. *See* Maj. Op. 41-42. That is simply beside the point, because all parties before us agreed that the SIPs at issue here do include emission limitations. *See infra* at 20-21. And *Sierra Club* instructs that when SIPs do include emission limitations those limitations must be continuous. 551 F.3d at 1027-28. In other words, when emission limitations are used, there is no option to exempt SSM periods altogether.

Other circuits have likewise accepted EPA's interpretation that emission limitations must apply continuously, including during startup, shutdown, and malfunction. In *Mont. Sulphur & Chem. Co. v. EPA*, 666 F.3d 1174 (9th Cir. 2012), the Ninth Circuit held that EPA,

when promulgating a federal implementation plan to fill gaps in a state SIP, "reasonably interpreted the Clean Air Act to require continuous limits on emissions," including during SSM events. *Id.* at 1193; *see also Kamp v. Hernandez*, 752 F.2d 1444, 1452-53 (9th Cir. 1985). The Sixth and Tenth Circuits, too, have upheld as reasonable EPA's longstanding interpretation of the Clean Air Act to bar SSM exemptions from emission limitations. *See Mich. Dep't of Env't Quality v. Browner*, 230 F.3d 181, 183-86 (6th Cir. 2000); *Ariz. Pub. Serv. Co. v. EPA*, 562 F.3d 1116, 1129 (10th Cir. 2009).

In short, there can be little doubt that emission limitations, wherever used, must apply continuously. And Petitioners do not argue that EPA's initial approval of a SIP, in the earliest days of its statutory role in doing so, should estop the agency from calling the SIPs to fix any legal deficiencies in such a plan. That then leaves the question whether the SSM provisions at issue in these SIP calls—namely, automatic exemptions, director's discretion provisions, and affirmative defenses—disrupt that continuity. EPA correctly found that they do.

1. Automatic exemptions violate the Act's requirement that emission limitations be continuous. Such provisions exempt sources from compliance with emission limitations during SSM events or other modes of operation, such that any excess emissions are not considered violations of the emission limitation. Take West Virginia's SIP as an example. West Virginia provides that limitations on visible emissions "shall apply at all times except in periods of start-ups, shutdowns and malfunctions." W. VA. CODE R. § 45-2-9.1. West Virginia's emission limitations thus apply continuously *except* during SSM periods. Such carve-outs run afoul of Congress's requirement for continuous emission limitations under section 7602(k). As in *Sierra Club*, those automatic exemptions

mean that no Clean Air Act-compliant standard governs periods of startup, shutdown, and malfunction—*i.e.*, there is no continuously applicable emission limitation. *See* 551 F.3d at 1027-28.

Petitioners claim that, even if the Act requires continuously applicable emission limitations, "general duty" provisions in SIPs remedy any discontinuity because a general duty applies to all periods of source operation. *See* Indus. Br. 38-40; State Br. 22-24. General duty provisions require, for example, sources to "minimize emissions," to "use good engineering judgment at all times," to avoid "improperly operating or maintaining facilities," or to avoid "caus[ing] a violation of the NAAQS at any time." 80 Fed. Reg. at 33,889/3-90/1, 33,903/1. We have held that such general duty provisions fail to satisfy the Clean Air Act's requirement for continuous emission standards. *See Sierra Club*, 551 F.3d at 1027-28.

Much as in *Sierra Club*, the generic general duty provisions in the SIPs called by EPA do not meet the Act's requirement for continuous emission limitations. For one, where general duty provisions "are not clearly part of or explicitly cross-referenced in a SIP emission limitation," they "cannot be viewed as a component of a continuous emission limitation." 80 Fed. Reg. at 33,890/1. And, absent any clear indication that general duty provisions are part of a continuous emission limitation, they may not be enforceable by EPA or citizens. *Cf. McEvoy v. IEI Barge Servs., Inc.*, 622 F.3d 671, 678 (7th Cir. 2010) (concluding that an Illinois SIP provision amounting to a "commandment 'thou shall not pollute'" could not be enforced through the CAA's citizen-suit provision); 80 Fed. Reg. at 33,903-904.

Moreover, some of the states' general duty provisions fail to meet the Act's "applicable stringency requirements for th[e] type of SIP provision" at issue. 80 Fed. Reg. at 33,890/1; *see id.* at 33,904/1; *cf. Sierra Club*, 551 F.3d at 1027-28. For example, a generic general duty provision may not satisfy the Act's requirement that stationary sources in nonattainment areas use "reasonably available control technology," 42 U.S.C. § 7502(c)(1), that certain sources in attainment areas use "best available control technology," *id.* § 7475(a)(4), or that certain older sources use "best available retrofit technology" as part of the regional haze program, *id.* § 7491(b)(2)(A).

For those reasons, EPA rightly determined that the generic general duty provisions in the called SIPs "do not meet applicable stringency requirements, are not clearly part of the emission limitations in the SIP-called provisions, and are likely not legally and/or practically enforceable." EPA Br. 69; *see* 80 Fed. Reg. at 33,903/2-04/2. As such, those general duty provisions do not "legitimize exemptions for emissions during SSM events" from otherwise-applicable emission limitations. 80 Fed. Reg. at 33,890/1.

2. Automatic exemptions are not the only SIP provisions that violate the continuity requirement. So do director's discretion provisions. They allow state air agency personnel to make "unilateral decisions on an *ad hoc* basis" to excuse compliance with emission limitations, "up to and including the granting of complete exemptions for emissions during SSM events." *Id.* at 33,917/2. The exercise of a director's discretion thereby has the effect of removing the otherwise-applicable emission limitation during the SSM event. Just as a state cannot automatically exempt SSM emissions from emission limitations, it cannot authorize a director's

insufficiently bounded, *ad hoc* exercise of discretion to do so. *See id.*

Director's discretion provisions have another defect: They interfere with EPA and citizen enforcement. "[B]y granting exemptions for emissions that should be treated as violations of the applicable SIP emission limitations," director's discretion "provisions functionally allow the air agency to impose its own enforcement discretion decisions on the EPA and other parties." *Id.* at 33,917/3. Such provisions thus interfere with federal and citizen enforcement of the Act. *See* 42 U.S.C. §§ 7413 (federal enforcement), 7604 (citizen enforcement). In that way, director's discretion provisions cannot be squared with the Clean Air Act's various enforcement requirements, including that SIPs generally provide for enforcement, *see id.* § 7410(a)(1), that emission limitations be "enforceable," *id.* § 7410(a)(2)(A), and that SIPs "include a program to provide for the enforcement" of their emission limitations, *id.* § 7410(a)(2)(C).

3. Last are the SIPs' affirmative defense provisions. As the majority recognizes, some affirmative defenses functionally "create an exemption from the normal emission rule." Maj. Op. 64. Therefore, like any other SSM exemption, they disrupt an emission limitation's continuity. That discontinuity suffices to justify the SIP Calls for the handful of affirmative defense provisions as to which my colleagues grant the petitions.

But there is another reason why EPA correctly called all SIPs containing affirmative defenses for SSM events. Affirmative defenses interfere with the Act's enforcement structure no matter "what forms of remedy they purport to limit or eliminate," 80 Fed. Reg. at 33,851/3—not just, as the majority holds, when they "preclude[] certain remedies" such

as civil penalties, Maj. Op. 64. Here is why. The Clean Air Act gives federal district courts jurisdiction over EPA enforcement actions, 42 U.S.C. § 7413(b), and citizen suits, *id.* § 7604(a), that claim violations of a SIP's emission limitations or standards. Congress vested in the courts the authority both "to determine liability" and "to impose remedies of various kinds," including but not limited to civil penalties. 80 Fed. Reg. at 33,851/3; *see* 42 U.S.C. §§ 7413(b), (e), 7604(a). That "grant of jurisdiction comes directly from Congress," and EPA is not, nor are the states, "authorized to alter or eliminate" it. 80 Fed. Reg. at 33,851/3. By including affirmative defense provisions for SSM exemptions in their SIPs, states attempt to restrict federal courts' jurisdiction to hold violators liable and fashion remedies for noncompliance with emission limitations. *Id.* at 33,851/3-52/1. Such defenses usurp the role that Congress reserved for courts in the Clean Air Act and so cannot stand. *See NRDC v. EPA*, 749 F.3d 1055, 1062-64 (D.C. Cir. 2014).

In short, Petitioners' challenges to EPA's SIP Calls of automatic exemptions, director's discretion provisions, and affirmative defenses lack merit. Because our review is generally confined to the issues presented by the parties, that should suffice for this court to deny the petitions in full.

## B.

My colleagues never reach the questions presented by Petitioners because, in their view, EPA failed to make a "predicate 'necessary or appropriate' finding" that they deem "required" by the Clean Air Act. Maj. Op. 55. In so holding, the majority disposes of the case on an unbriefed theory that depends on a blinkered reading of the record.

My colleagues vacate the SIP Calls because EPA "merely reasoned" that emission limitations must be continuous,

"without explaining why that continuity is 'necessary or appropriate' to meet any of the CAA's requirements." Maj. Op. 56. Their holding hangs on a distinctive reading of the Clean Air Act's section 7410(a)(2)(A). Recall the terms of that provision: It instructs that each implementation plan shall "include enforceable emission limitations and other control measures, means, or techniques (including economic incentives such as fees, marketable permits, and auctions of emissions rights), as well as schedules and timetables for compliance, as may be necessary or appropriate to meet the applicable requirements" of the Act. 42 U.S.C. § 7410(a)(2)(A). The majority says the "necessary or appropriate" proviso prevents EPA from faulting the discontinuity of a SIP's emission limitations until it deems it at least appropriate to treat them as "enforceable emission limitations"—rather than, say, "other control measures, means, or techniques." *See* Maj. Op. 36, 42.

But the Petitioners never argued before us that EPA needed to make—let alone that it did not make—a predicate "necessary or appropriate" determination before accepting Petitioners' own labeling of the subject emission controls as "emission limitations." *See generally* Indus. Br. 36-60; States Br. 22-38. In fact, the Petitioners took issue with the SIP Calls in part on the ground that it is up to *states* when they fashion the SIPs, not EPA, to decide what is "necessary or appropriate." *See* States Br. 4-5; Indus. Br. 21, 36. Likewise, the Petitioners do not dispute that the assertedly discontinuous control measures subject to these SIP Calls were included in SIPs because states believed them "necessary or appropriate" for Clean Air Act compliance, and EPA approved them as such (albeit in approvals it now says overlooked unlawful discontinuities). To the contrary, Petitioners fault EPA for "overruling state decisions" about the measures necessary or appropriate to comply with the Act. Indus. Br. 20; *see* States

Br. 4-5. The majority's reliance on the fact that EPA "nowhere disputes" that emission limitations are required only as "necessary or appropriate," Maj. Op. 44, is startling given that the Petitioners did not argue as much before us.

The sentence my colleagues quote from the Industry Petitioners' brief as "exactly" making their argument, Maj. Op. 59 (quoting Ind. Pet. Br. 49), in fact disputes only EPA's understanding of the continuity requirement. It appears under the header "EPA's Prohibition on So-Called 'Exemptions' from Emission Limitations Is Not Supported," Ind. Pet. Br. 36, where Industry Petitioners argue against EPA's view of the "so-called exemptions," Ind. Pet. Br. 36-52. Only the majority doubts the characterization of the subject SIP provisions as (so called) emission limitations per section 7602(k).

To be sure, the Industry Petitioners (but not the states) at times argued that SSM exemptions were permissible because a state could determine that emission limitations were only "necessary or appropriate" for particular periods of source operation. Indus. Br. 36, 51. They assert that the "necessary or appropriate" language gives states discretion to decide that an emission limitation will apply only to steady-state operation and not to SSM periods. Indus. Br. 49, 51. Under that reading, an emission limitation meets the Clean Air Act's requirements if it is "'continuous' over some period of time or condition," even if "not necessarily [over] *all* periods of time." Indus. Br. 42. In short, Industry Petitioners assume that the SIPs at issue include emission limitations within the meaning of the Act but argue that the challenged SSM exemptions permissibly apply because the Act empowers the states to decide that fully continuous application is not "necessary or appropriate." Indus. Br. 49.

All Industry Petitioners argued, then, is that the "necessary or appropriate" clause justifies exemptions to emission limitations—not that the SIPs might not even, technically speaking, include emission limitations at all, *see* Maj. Op. 35-38, nor that EPA needed to determine that continuous emission limitations were necessary or appropriate before calling the SIPs, *see* Maj. Op. 48-49. At core, Industry Petitioners fought the definition of an emission limitation as "continuous" and our construction of that definition in *Sierra Club*, 551 F.3d at 1026-28, not the reality that the SIPs at issue do include "emission limitations" that must comply with the Act's definition.

For us to rule for Industry Petitioners on that theory, we would therefore have needed to conclude first that *Sierra Club* was wrong or somehow did not apply. The majority instead eschews interpreting the continuity requirement and pivots to even more fundamental (and unbriefed) questions: must SIPs contain "emission limitations" at all, and must we presume they do not unless EPA has made a predicate determination that it is "necessary or appropriate" for a measure to qualify as an "emission standard"? *See* Maj. Op. 34.

To answer that question the majority deploys a novel reading of the Clean Air Act, concluding that a SIP must include "emission limitations" only to the extent "necessary or appropriate to meet the applicable requirements" of the Clean Air Act. Maj. Op. 7-8 (quoting 42 U.S.C. § 7410(a)(2)(A)). Relying on this new reading of section 7410, my colleagues conclude that, in the absence of an explicit EPA categorization of challenged provisions as "emission limitations," we should presume the SIPs at issue here do not contain emission limitations at all. Their reading seems to require EPA to make a "predicate finding" as to *any*

SIP provision that it is "necessary or appropriate" to treat it as what a state says it is—as opposed to some other measure or means—before a court may so treat it. Maj. Op. 36. Consider a SIP that transparently announces what appears to be a schedule or timetable for compliance as contemplated by section 7410. 42 U.S.C. § 7410(a)(2)(A). On the majority's logic, may we no longer take a SIP at its word and treat its compliance deadlines and timeframes as "enforceable" "schedule[s] and timetable[s] of compliance" under the Act, 42 U.S.C. § 7602(p), unless EPA finds it "appropriate" or "necessary" that the timing requirements be so treated?

More to the point, the Petitioners do not dispute that the SIPs at issue needed to, and appropriately do, include "emission limitations." Indeed, the states have repeatedly told us that their SIPs do contain emission limitations as contemplated by the Clean Air Act:

- In their briefing the states refer to the disputed emission limitations as "emission limitations." *See, e.g.*, States Br. 24-29; States Reply Br. 1, 8, 11-12. Industry Petitioners even describe the provisions subject to the disputed SSM carveouts as "numerical" or "numeric emission limitation[s]." Ind. Pet. Br. 37. That quantitative descriptor highlights that the referenced "emission limitations" are indeed limits on the "quantity, rate, or concentration of emissions" within the meaning of section 7602(k), and so subject to its continuity requirement.
- In their comments on the SIP Calls the states refer to the disputed emission limitations as "emission limitations." *See, e.g.*, Comment of Ohio (J.A. 529-30) (explaining that Ohio has never taken the position that excess emissions are not violations of emission limitations); Comment of Georgia (J.A. 575-76)

("EPA's proposal if finalized would likely require that Georgia evaluate all of the emission limitations in Georgia Rule 391-3-1-.02 . . . ."); Comment of Delaware (J.A. 600) ("As such, Delaware's SIP provides for continuous limits; at no time does Delaware's SIP provide for any unit to be 'exempted' from being covered by an emission limitation."); Comment of West Virginia (J.A. 630) ("Emissions that occur during SSM must be subject to a continuous limitation, and emissions that occur during regular operations may be subject to a different, but also continuously applied, limitation."); Comment of Florida (J.A. 746) ("Florida's rule establishes enforceable, alternative emissions limitations and measures such that an emission limitation applies continuously . . . .").

- Even in the enacted SIPs *themselves* the states refer to the disputed emission limitations as "emission limitations." *See e.g.*, S.C. CODE ANN. REGS. 61-62.1 §§ I(29), V(A) (2016) (explaining that the state developed its implementation plan "to provide enforceable emission limitations" and that an emission limitation "limits the quantity, rate, or concentration of emissions of air pollutants on a continuous basis"); 118-01-19 ARK. CODE. R. § 602 (2022) (providing an affirmative defense for exceedances of "emission limitation[s]" during emergency conditions); LA. ADMIN. CODE tit. 33, pt. III, § 103(A) (2023) (directing that the SIP's "emission limitations apply to any source of emissions existing partially or wholly within the state of Louisiana").

There is thus *every* indication that the states, in submitting SIPs to fulfill their legal obligations under the Clean Air Act, intended to include "'emission limitation[s]' *as defined by the*

*CAA*." Maj. Op. 53 (emphasis added). And there is every indication the Petitioners are defending those emission limitations' compliance with the Act's requirement that they be continuous. Why not take them at their word?

The majority sidesteps those admissions to posit that the Clean Air Act *could* allow for a SIP that contains various emission control measures, "none of which satisf[ies] the CAA's definition of 'emission limitation.'" Maj. Op. 37. Assuming the text may be so read, the permissibility of that hypothetical is beside the point. As EPA explained at argument, "if [a] state[] were to bring a plan to EPA that contained just control measures and not emission limitations and said that [it] me[t] the requirements of the Clean Air Act, then EPA could assess that plan." Oral Arg. Tr. 68:14-17. But here, states "picked emission limitation[s] as one element of their plan[s]." Oral Arg. Tr. 68:18-19. That choice is reason enough to treat the SIPs under review as containing "emission limitations" within the meaning of the Act.

Moreover, the majority provides no indication (nor is there any, as far as I can tell) that any state has *ever*—in the more than fifty years of the Clean Air Act's existence—submitted and received approval for a SIP without provisions that appear to be (and have been treated as) "emission limitations." That is no accident. Emission limitations are at the heart of a state's responsibilities to reduce emissions pursuant to the Clean Air Act. In assigning to the states certain responsibilities under the Act, Congress sought to ensure that "[e]ach source's prescribed emission limitation" would be "the fundamental tool for assuring that ambient standards are attained and maintained." H.R. REP. NO. 95-294, at 92.

Whatever the case for statutory permissibility of a hypothetical SIP devoid of emission limitations, there is certainly no basis for concluding that the challenged SIP provisions in this case were simply not emission limitations at all, nor have the Petitioners so argued. Yet that conclusion is the linchpin of the majority's call for a re-do.

It makes sense that these state plans, first formulated in the early 1970s, all do include "emissions limitations" within the meaning of the Clean Air Act. Before the 1990 amendment of the Act, an earlier version of section 7410 (then codified at 42 U.S.C. § 1857c-5) instructed that state plans shall "include[] emission limitations, schedules, and timetables for compliance with such limitations, and such other measures as may be necessary . . . ."—a formulation that courts read to require "emission limitations." *See Kennecott Copper Corp. v. Train*, 526 F.2d 1149, 1153-54 (9th Cir. 1975) (quoting 42 U.S.C. § 1857c-5(a)(2)(B) (1970)); *see id.* at 1153-56 (collecting cases). It was not until Congress amended that provision in 1990 that it added "or appropriate" and changed the syntax to the current version, on which the majority depends for its holding that "emission limitations" are optional unless EPA deems them "necessary or appropriate." Given the pre-1990 origins of the relevant emission-control measures in the SIPs (and the challenged loopholes), it is no wonder that every one of the petitioning states treats them as "emission limitations."

The states proffered and EPA accepted SIPs that purported to include "emission limitations" as defined by the Clean Air Act. *See* 80 Fed. Reg. at 33,902/2. Petitioners seek to defend them as "emission limitations" that meet the requirement of "continuous emission reduction." It is entirely unsurprising that EPA "never wholeheartedly embraces" my emphasis on the states' own consistent description of the

relevant SIP provisions as "emissions limitations." Maj. Op. 52; *see id*. 25. The Petitions never said they were anything else.

Our judicial role is as "neutral arbiter[s] of matters the parties present." *United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020) (quoting *Greenlaw v. United States*, 554 U.S. 237, 243 (2008)). In our adversarial system, "we rely on the parties to frame the issues for decision." *Id.* (quoting *Greenlaw*, 554 U.S. at 243). So, our "well-established" rule is that "we do not consider arguments not presented to us," *Diamond Walnut Growers, Inc. v. NLRB*, 113 F.3d 1259, 1263 (D.C. Cir. 1997) (en banc), even if those arguments can be supported by citations to the administrative record, *see NRDC v. EPA*, 25 F.3d 1063, 1071 n.4 (D.C. Cir. 1994). And we are especially reluctant to consider unbriefed or inadequately briefed arguments where they raise "important questions of far-reaching significance," *Carducci v. Regan*, 714 F.2d 171, 177 (D.C. Cir. 1983) (quoting *Ala. Power Co. v. Gorsuch*, 672 F.2d 1, 7 (D.C. Cir. 1982)), or implicate a complex regulatory scheme, *see Time Warner Ent. Co., L.P. v. FCC*, 56 F.3d 151, 202 (D.C. Cir. 1995). Every reason calls for restraint.

Today's decision well illustrates why we ordinarily stick to what the parties have argued. Without the benefit of the parties' presentation, it is difficult to say just how wrong or damaging the majority opinion might be. What I can say is that my colleagues unearth—and, in some cases, answer—a host of questions that were not raised in the briefing and that we had never resolved before today.

Here is the strange upshot of the majority's interpretation of section 7410(a)(2)(A): Provisions that otherwise look like and are treated as emission limitations are reviewed as "other

control measures," undefined under the Act, precisely *because* they are discontinuous. *See* Maj. Op. 37. Under that logic, a flawed emission limitation is simply no emission limitation at all and so the continuity question that was briefed and argued in this case just goes away. For the majority, it does not matter whether the called SIPs lack continuous protection against harmful emissions, because if the emission limitations in the SIPs were actually just "other control measures," the statute does not require them to apply continuously.

But it is not evident that emission limitations and "other control measures" are interchangeable but for the requisite continuity of the former, and we lack the benefit of briefing on the matter to determine the boundaries of either. In the Clean Air Act, Congress gave examples of "other control measures, means, or techniques"—namely, "economic incentives such as fees, marketable permits, and auctions of emissions rights." 42 U.S.C. § 7410(a)(2)(A). In so doing, Congress illustrated the kinds of "other control measures" it had in mind. They stand in contrast to an emission limitation, "which limits the quantity, rate, or concentration of emissions of air pollutants on a continuous basis, including . . . any design, equipment, work practice or operational standard promulgated under this chapter." *Id.* § 7602(k). Indeed, to the extent "other" measures are ways of harnessing market power to make underlying emission limitations more efficient, they seem to presuppose "emission limitations" as a distinct but complementary counterpart.

## C.

Cabining the reach of its holding, the majority notes that, going forward, EPA may ensure that states' pollution restrictions are "enforceable emission limitations" for

purposes of a SIP by making a predicate "necessary or appropriate" finding to that effect. Maj. Op. 37-38, 40, 55. Never mind that Petitioners did not argue that the Clean Air Act imposes any such predicate, nor did they object that provisions in the SIPs failed to meet it.

In so doing, the majority surmises both who must make a necessary-or-appropriate determination (EPA, say my colleagues) and when (before calling the SIPs, they say). Remember, though, that section 7410(a)(2) describes what "[e]ach implementation plan *submitted by a State*" shall include. 42 U.S.C. § 7410(a)(2) (emphasis added). It thus appears—as the Petitioners themselves argued—that Congress called on the *states* to determine in the first instance what measures they believe are "necessary or appropriate," subject to EPA approval. *See* Indus. Br. 53; States Br. 4-5. Perplexingly, though, it is not enough for the majority that the states that proffered the SIPs, and EPA when initially approving them, concluded that emission limitations are at the very least appropriate to comply with the Act. *See* 80 Fed. Reg. at 33,902/2-3. The fact that EPA simultaneously approved SSM exemptions, *see* Maj. Op. 50–51, shows only that a newly created EPA was rushing to approve the SIPs on too tight a timeline—not that the challenged SIP provisions were simply not "emission limitations" at all.

## D.

In short, if anyone has manufactured a "semantic 'gotcha' game," Maj. Op. 53, it is the majority. According to my colleagues, an emission reduction measure that is a "design, equipment, work practice or operational standard" that "limits the quantity, rate, or concentration of emissions of air pollutants," 42 U.S.C. § 7602(k), that a state labeled an "emission limitation" and submitted to EPA to show how it

planned to meet the Act's requirements, that EPA then approved as an appropriate way for the state to do what the Act necessitates, 80 Fed. Reg. at 33,902/2-3, and that states, industry, and EPA all have for decades treated as an emission limitation, might not be an emission limitation after all. That cannot be right. If it looks like a duck, swims like a duck, and quacks like a duck, then it probably is a duck.

While I believe the majority erred, it helps that its core holding is limited. Presumably EPA can re-issue the vacated SIP Calls. My colleagues tell the agency simply to show that continuous emission limitations are "necessary"—or even just "appropriate"—to meet Clean Air Act requirements. That is a low bar. No factual showing would necessarily be required. *See* Maj. Op. 14-25. And EPA's insistence that emission limitations operate continuously would simply reiterate its longstanding policy, beginning in 1977, that SSM exemptions are inconsistent with the Clean Air Act. *See* J.A. 125. It might even be enough for EPA to point out that the called SIPs are ambiguous as to whether they do contain "emission limitations." *See* Maj. Op. 27-28. What is more, nothing in today's decision forecloses EPA from calling SIPs because they contain emission limitations that are discontinuous due to SSM exemptions, *see* Maj. Op. 34, or fail to include measures that meet the statutory definition of emission limitations, *see* Maj. Op. 37, or interfere with the Clean Air Act's enforcement scheme, *see* Maj. Op. 39, or interfere with EPA's ability to predict compliance with the Act, *see id*. The court's opinion also does not categorically preclude EPA, going forward, from pointing to its initial approval of SIP provisions to establish that those provisions were "necessary or appropriate" to meet Clean Air Act requirements. *See* Maj. Op. 55-56.

So, while the majority goes down a path that it never should have considered, resulting in more years of delay in controlling harmful emissions, the fallout may be more contained than it appears at first glance.

\* \* \*

In brief, EPA correctly called SIPs for containing SSM provisions that violated the Clean Air Act's requirement of continuous emission limitations.  This court should have acknowledged that the states appropriately included emission limitations in their SIPs, the Act says an emission limitation must be continuous, and the SIP provisions rendering them discontinuous necessitated EPA's SIP Calls.  My colleagues provide no practical reason to doubt that the continuous applicability of the SIPs' emission rules is indeed "necessary or appropriate."  Yet the majority assigns to EPA a procedural step it claims was missed:  What everyone refers to as emission limitations should not be treated as such under the Act unless EPA first finds that it was "necessary or appropriate" that they were included as "emission limitations" in the SIPs.  In vacating EPA's SIP Calls on that ground, the majority strays from the briefing, from our circumscribed judicial role, and from the mandates of the Clean Air Act.  On these issues only, I respectfully dissent.